**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARA HEDRICK | ) | |
| | ) | |
| and | ) | CASE NO. 2:19-CV-1326 |
| | ) | |
| THOMAS HEDRICK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| OHIO HEALTH CORPORATION, | ) | |
| | ) | **COMPLAINT** |
| Defendant. | ) | Trial by Jury Demanded |

PRELIMINARY STATEMENT

1.      Plaintiffs Sara Hedrick and Thomas Hedrick, father and daughter, (collectively "the Hedricks") commence this action against Defendant Ohio Health Corporation ("OHC") for disability discrimination under Title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973. See Exhibit A, February 6, 2019 Rule 65 Notice.

2.      Sara Hedrick is an individual with invisible disabilities who uses her trained psychiatric service dog, Rufus, to mitigate the effects of her disability and to live independently in the world.

3.      Thomas Hedrick is not physically well. He has suffered a series of strokes and other debilitating conditions requiring lengthy hospitalization. He was OHC's patient.

4.      Sara Hedrick sought access from OHC to visit her ailing father with her service dog. OHC refused to allow Ms. Hedrick to visit in the company of Rufus.

5.      Over the Hedricks' objections, OHC denied Sara Hedrick's access to visit with her father and denied Thomas Hedrick's right to be visited by and to associate with his daughter, specifically and solely, on the basis of her disability.

1

6.     The Hedricks seek injunctive relief, declaratory relief, compensatory and punitive damages, attorney's fees and litigation costs.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Ms. Hedrick's claims pursuant to 28 U.S.C. §§ 1331, 29 U.S.C. § 794, and 42 U.S.C. §§ 12181, *et seq*.

8.     Venue is proper in this forum pursuant to 28 U.S.C. §1391 (b)(1) because the events giving rise to these claims occurred in Franklin County, Ohio.

## PARTIES

9.     Plaintiff Sara Hedrick is a resident of Franklin County, Ohio.

10.     Plaintiff Thomas Hedrick is resident of Franklin County, Ohio.

11.     Defendant Ohio Health Corporation is a not-for-profit system of hospitals and healthcare providers that include but are not limited to Riverside Methodist Hospital, Grant Medical Center, Doctors Hospital, and Dublin Methodist Hospital. OHC's principal place of business and corporate office is located in Franklin County, Ohio.

## FACTS

12.     Sara Hedrick is 36 years old. She has posttraumatic stress disorder, major depressive disorder (recurrent, severe without psychotic features), dissociative disorder not otherwise specified and low blood sugar.  Her impairments substantially limit one or more of her major life activities and manifest in and cause "meltdowns."

13.     During a meltdown, Ms. Hedrick feels as if the world is closing in, she has tunnel vision and she engages in stimming (short for "self-stimulatory") behavior: hitting herself in the face, head banging, hand flapping, spinning her ring, pacing, rocking, repeating words or statements over and over, and shutting down verbally. During a meltdown, she is unable to care for herself,

perform manual tasks, learn, read, concentrate, think, communicate, or work.

14.     Meltdowns are traumatic and very unpleasant occurrences for Ms. Hedrick.

15.     Ms. Hedrick uses a service animal, a standard poodle named Rufus, to mitigate effects of her disabilities. Before she acquired a service animal, Ms. Hedrick had meltdowns on regular basis and occasionally in public. She feared going to public places alone knowing that a random encounter could trigger and escalate into a full blown incapacitating meltdown. She had extreme anxiety and fear of being in public on her own. She rarely left her home unless in the company of her sister, Tara Colon, or close family friend, Gail Burkholder ("Burkholder"). She limited her public life experiences to routine activities in familiar places - healthcare appointments, grocery shopping and visiting family.

16.     Ms. Hedrick is an experienced service dog trainer. She trained Rufus to prevent or interrupt the onset of a meltdown.

17.     Rufus is trained to identify the onset of a meltdown and to interrupt it using tactile alerts and, if needed, to escalate to bark alerts. By providing a nudge or a bark, Rufus alerts and draws Ms. Hedrick's attention and focus onto him and the present moment. Rufus provides deep pressure therapy and alerts Ms. Hedrick when she needs sugar to keep her blood sugars balanced.

18.     With Rufus, Ms. Hedrick has fewer and shorter meltdowns.

19.     She depends upon Rufus to access and enter public spaces and to engage in public activities on her own because Rufus enables her to control and mitigate the effects of her disabling conditions. With Rufus, Ms. Hedrick is more able to confidently and independently enjoy life's public activities.

20.     At all times relevant, Rufus was housebroken, leashed, was current on his vaccinations, licensed by Franklin County, healthy, clean, well-behaved and well-controlled by Ms. Hedrick.

21. Unless otherwise specified, Rufus was present and under Ms. Hedrick's control during the events described herein.

22. Thomas Hedrick is 70 years old. He experienced his first stroke in 2017. Since that time, he has had multiple strokes, which have deprived him of his mobility, caused aphasia and ventricular fibrillation, and required surgery on his carotid artery. He is frail and unable to independently ambulate.

23. Mr. Hedrick received in-patient care from OHC in February, April, July, October 2018 and March 2019. Thomas Hedrick was a patient of OHC and will likely return to OHC for his healthcare.

24. Mr. Hedrick to continue to receive medical care from OHC when he requires hospitalization.

25. Sara Hedrick and Thomas Hedrick are daughter and father. At all times relevant, OHC knew that Sara Hedrick was Thomas Hedrick's daughter.

26. Thomas Hedrick appointed Sara Hedrick as his power of attorney and his person to contact in an emergency with his landlord and other entities. He relies upon and consults with Ms. Hedrick to make his healthcare decisions.

27. Thomas Hedrick lives in an assisted living apartment. His mobility is very limited. He is unable to move from his bed into a chair independently. He relies on in-home healthcare aides to monitor his conditions and to notify Ms. Hedrick when his condition warrants concern and/or hospitalization.

28. Sara Hedrick regularly visits her father three days a week. They talk by telephone daily. Sara Hedrick, her father and family friend, Gail Burkholder ("Burkholder") form and are a close-knit support system.

4

29.     Riverside Methodist Hospital ("Riverside")'s general visiting hours were daily from 11 a.m. to 8:30 p.m.

30.     At all times relevant, Sara Hedrick requested access to OHC and her father during general visiting hours, excluding the emergency room.

31.     OHC is a recipient of federal financial assistance because it accepts, inter alia, Medicare and Medicaid.

FEBRUARY 2018

32.     On February 10, Mr. Hedrick had stroke that caused him to fall and break his hip. He was taken to Riverside by ambulance. OHC admitted him to the Blue Tower.

33.     Ms. Hedrick visited him daily and was not delayed or denied access to visit with her father in the emergency room or in the Blue Tower in February 2018.

34.     On February 22, OHC transferred Mr. Hedrick to its Rehabilitation Hospital.

35.     OHC delayed her access to her father on three occasions by asking improper questions. OHC staff intruded into visits for the purpose of seeing and petting her service dog.

36.     Ms. Hedrick visited her father daily until he was discharged on March 5, 2018.

APRIL 2018

37.     On April 1, Mr. Hedrick's aides determined he was bleeding into this stomach and required emergency treatment. The aides notified Ms. Hedrick and called an ambulance that rushed Mr. Hedrick to Riverside's emergency room.

38.     Ms. Hedrick and Rufus met her father at the emergency room and waited with him to be admitted for in-patient care.

39.     On April 2, OHC admitted Mr. Hedrick and transferred him to the Vascular Thoracic Surgery (VST) floor.

40. VST floor is considered an intermediate care floor. VST is an area of Riverside where healthcare personnel, visitors and patients are permitted to enter without taking precautions to prevent transmission of infectious agents.

41. Healthcare personnel, visitors and patients were permitted to enter Mr. Hedrick's room without taking precautions to prevent transmission of infectious agents.

42. On April 2, 2019, Ms. Hedrick entered the VST floor, walked to the end of the hallway, and entered Mr. Hedrick's room.

43. Mr. Hedrick's assigned nurse followed Ms. Hedrick into the room and said: "I'm sorry you can't have your dog here" and "My nurse manager told me the dog is not allowed on this unit."

44. Ms. Hedrick stated she that was disabled, that Rufus was a service animal and that she and Rufus were permitted in her father's hospital room under the ADA. Ms. Hedrick and Mr. Hedrick objected to OHC not permitting Sara Hedrick to visit and asked the nurse to explain why a service animal was not allowed.

45. The nurse left to consult the nurse manager. The nurse returned and reported that her nurse manager said that the dog is not allowed on this unit and that Ms. Hedrick needed to leave with her dog.

46. Ms. Hedrick complained to guest services and stated that she was permitted to have her special animal under the ADA.

47. OHC stated that Mr. Hedrick was in a "special unit" and that services animals were not allowed VST floor.

48. On April 2, OHC permitted Burkholder to visited Thomas Hedrick on the VST floor and did not require her to take precautions to prevent transmission of infectious agents.

6

49.     On April 3, Ms. Hedrick visited, without Rufus, in the company of her sister. OHC did not require Ms. Hedrick or her sister to take precautions to prevent transmission of infectious agents.

50.     Without Rufus to mitigate the effects of her disabilities, Ms. Hedrick felt very scattered, anxious, unfocused, distracted, and stressed during the April 3 visit.

51.     Ms. Hedrick did not return to OHC for the remainder of Mr. Hedrick's April hospitalization. But for OHC's decision to bar her service dog from the VST floor, Ms. Hedrick would have visited Thomas Hedrick each day of his stay.

52.     Acting on Ms. Hedrick's behalf, Burkholder communicated with OHC and objected to its April 2, 2018 to deny Ms. Hedrick's access to the VST floor because of her service dog.

53.      On April 6, 2018, Burkholder emailed OHC's Dr. Marian Schuda.

To summarize our discussions, the VST is considered an intermediary surgical floor and the infectious disease control department has decided that service dogs are to be excluded for both patients and visitors. We agree that there are no germ control procedures (gowns, masks, etc.) in place for human visitors to the VST. You have stated that some patients may be allergic to dogs and that some may have drains or other medical apparatus. You have also said that hospital staff has and will perform any task that a service dog is trained to provide for their handler. You have suggested that the handler consult with the patient's doctor to see if moving the patient to a different unit, where presumably service dogs are given access by Riverside Methodist Hospital, would be medically possible or advisable.

I am formally asking for an accommodation for the family of Thomas Hedrick for the duration of his stay at Riverside Methodist Hospital's Vascular and Thoracic Surgery unit, as well as any other unit, floor or division that does not have germ control procedures for human visitors, to allow visitation by his daughter accompanied by her service dog. Please advise of your decision in writing at the earliest possible time."

See Exhibit B, April 6, 2018 Burkholder email

54.     OHC did not review or modify its April decision to exclude Ms. Hedrick from her father on the VST floor. OHC denied Ms. Hedrick access to her father from April 2, 2018 until he was discharged, on or about April 10, 2018.

55.     On April 20, 2018, Ms. Hedrick filed a Charge of Discrimination by a Public Accommodation on the basis of Disability (service animal access) with the Ohio Civil Rights Commission.

56.     On May 1, 2018, Chad Helmick, OHC System Vice President & Associate General Counsel, sent the email attached as Exhibit C, April 19 to May 1, 2018 email exchange.

57.     OHC implemented an Animal Visitation Infection Prevention Guidelines, Policy & Procedure Number I-600.022 on the Effective Date, July 20, 2018, which is attached as Exhibit D.

## JULY 2018

58.     On July 25, Thomas Hedrick's home healthcare aides notified Ms. Hedrick that Mr. Hedrick exhibited stroke symptoms and required emergency care. Mr. Hedrick was transported to Riverside emergency room by ambulance.

59.     At or about 10:30 p.m., Ms. Hedrick arrived at Riverside's emergency department. Ms. Hedrick was very anxious about returning to OHC and very concerned about her father's conditions. When she approached the front desk, OHC confirmed that Mr. Hedrick arrived and told her to wait.

60.     As she waited, Ms. Hedrick's anxiety increased when she observed a nurse looking at her and talking on the telephone. The nurse approached Ms. Hedrick and stated: "Is he a therapy dog?",  "He can't go back there due to allergies", and "My charge nurse said I need to see documentations."

61.     This exchange triggered Ms. Hedrick to experience symptoms of a meltdown. She began to repeat herself uncontrollably, and repeatedly said: "It's illegal to ask for documentations. There is no documentations. He has access to be here." Ms. Hedrick gave that nurse a business-

sized ADA information card. That nurse left.

62.     A second nurse approached Ms. Hedrick and informed her that her service dog was allowed back in the emergency area.

63.     Ms. Hedrick joined her father in the emergency area, but she was so upset from the exchange that she contacted Burkholder and asked her come to Riverside for additional support. Burkholder arrived around 11:30 p.m. See Exhibit E, July 26, 2018 Burkholder email, which is incorporated by reference as if fully written herein.

64.     Ms. Hedrick left OHC after Mr. Hedrick was admitted. She experienced great anxiety and fear in connection with returning to OHC, which triggered her disabilities to manifest in a series of meltdowns. She was unable to return to OHC during the remainder of Thomas Hedrick's July 2018 in-patient OHC hospitalization.

65.     Ms. Hedrick would have visited her father every day of his July 2018 hospitalization but for OHC's April 2018 denial and failure to comply with the ADA.

OCTOBER 2018

66.     On October 3, Mr. Hedrick experience stroke symptoms and was rushed to Riverside by ambulance.

67.     On October 3, Ms. Hedrick went to emergency room and the concierge asked her to sit down as they checked on her father. A charge nurse approached Ms. Hedrick and asked whether Rufus was a service animal required because of disability and what work or task Rufus had been trained to perform. Ms. Hedrick answered that Rufus is a service animal trained to alert, nudge, and redirect her. The nurse left stating that she needed to verify that Rufus was permitted in the emergency room. The charge nurse did not return for 20 minutes.

68.     During the delay, Ms. Hedrick experienced stress, frustration and building anxiety that

she was going to be denied access to the facility and visitation with her father. After few minutes, she went to the Customer Experience Office and spoke to Kathy. Ms. Hedrick was upset and repeating herself when speaking to Kathy. She told Kathy what occurred with the charge nurse and asked why she was being denied access to the emergency room after she answered the permitted questions regarding her service animal.

69.     The charge nurse found Ms. Hedrick in office and stated that she and her service animal were allowed in the emergency room.

70.     Mr. Hedrick was admitted to the Orange Unit and Ms. Hedrick visited with her father in the hospital on October 4, 5, 6, and 7 without incident.

71.     On October 8, Mr. Hedrick had a surgery and was transferred to the Silver Unit for recovery.

72.     The Silver Unit is considered an intermediate care unit.  The Silver is an area of Riverside where healthcare personnel, visitors and patients are permitted to enter without taking precautions to prevent transmission of infectious agents.

73.     On October 8, 2018, as Ms. Hedrick approached the Silver Unit to visit her father, OHC staff stopped her and told her was not allowed in the Silver Unit because of her service dog.

74.     Ms. Hedrick left the Silver Unit and when to the main customer service desk and then to Kathy of the Customer Experience Office. As she interacted with OHC staff, Ms. Hedrick was visibly upset and she experienced manifestations of a meltdown in which she repeated words or statements over and over. Ms. Hedrick stated that service animals are allowed access to all areas where the public is normally allowed to go and asked why OhioHealth continued to deny her every time she came to see her Dad. She repeated these statements over and over. Ms. Hedrick was noticeably upset. Rufus alerted and interrupted the meltdown. Ms. Hedrick left and did not

return to visit during the rest of his October hospitalization.

75.     On October 8, Ms. Hedrick received a voicemail from Kathy at Riverside's Customer Experience office stating she spoke with the nursing administrator and double checked the policy. She stated that no service animal was allowed in the "pre-op" area and "pre-op" was considered a sterile area because spinal taps, anesthesia, and intravenous (IVs) were administered in the area.

76.     OHC did not OHC did not review or modify its October decision to exclude Ms. Hedrick from her father on the Silver Unit. OHC denied Ms. Hedrick access to her father from October 8, 2018 until he was discharged, on or about October 13, 2019.

77.     Ms. Hedrick did not return to OHC for the remainder of Mr. Hedrick's October hospitalization. But for OHC's decision to bar her service dog from the Silver Unit, Ms. Hedrick would have visited Thomas Hedrick each day of his stay.

FEBRUARY 2019 to PRESENT

78.     On  February 6, 2019, Ms. Hedrick notified OHC that its conduct constituted disability discrimination under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 and demanded injunctive relief under Rule 65 of the Federal Rules of Civil Procedures.  See Exhibit A.

79.     On March 1, 2019, OHC agreed to and implemented a temporary special accommodation for Ms. Hedrick, to wit: Ms. Hedrick agreed to notify OHC, via counsel, immediately prior to seeking access to its facilities and OHC agreed to take steps to ensure that its staff and employees do not delay or deny Ms. Hedrick and her service animal access to areas of its facilities where the general public is allowed.

80.     On March 14, 2019, the Civil Rights Commission determined that it was PROBABLE

that OHC engaged in unlawful discriminatory practice in violation of Ohio Revised Code Section 4112. The Commission attempted conciliation, which has since failed.

81. On March 23, 2019, Mr. Hedrick was transported to OHC Riverside's emergency department. Ms. Hedrick notified OHC before seeking access.

82. Ms. Hedrick experienced great anxiety and distress in connection with returning to OHC. Ms. Hedrick relied on Burkholder to be present to meet her in the lobby, to walk with her to the elevators and to Thomas Hedrick's patient room and to escort her out of OHC at the end of the visit.

83. OHC admitted Mr. Hedrick to the Orange Unit and he remained in-patient from March 24 to 29, 2019. Ms. Hedrick, Rufus, and Burkholder visited Mr. Hedrick daily.

## HEDRICK DAMAGES

84. OHC impeded, delayed and/or denied Ms. Hedrick's access to areas of its healthcare facilities where other visitors were allowed to go on the basis of her disabilities.

85. Thomas Hedrick required life-saving in-patient care from OHC. OHC delayed and denied Ms. Hedrick's access to her father when she desperately needed and wanted to see her father, to assess his condition for herself, and to be present with him to support and comfort him as he lay ailing.

86. But for OHC's conduct, Ms. Hedrick would have visited Mr. Hedrick on April 2, 3, 4, 5, 6, 7, 8, 9 and 10, every day of his July 2018 hospitalization, and on October 8, 9, 10, 11, 12, and 13.

87. OHC discriminated against Thomas Hedrick upon the basis of his association with an individual with disabilities.

88. As Thomas Hedrick lay in his hospital bed, feeling physically weak and worn, OHC

12

ejected Ms. Hedrick from his room, over his objection.

89.    OHC caused Mr. Hedrick emotional distress and immense frustration at his inability to protect his daughter; caused Mr. Hedrick to feel impotent, powerlessness, despair, anger, and helpless as he witnessed OHC trigger Sara's disabilities; deprived Mr. Hedrick of the comfort and solace from the presence of his daughter when he was critically ill and facing his own mortality.

90.    Each incident in which OHC delayed and/or denied Ms. Hedrick access caused undue and compounding stress, anxiety and fear and triggered the symptoms of her disabilities to manifest.

91.    OHC caused Sara Hedrick to experience trauma and extreme emotional distress and exacerbated the symptoms of her disabilities It repeatedly triggered the manifestations of her disabilities. Ms. Hedrick continues to experience significant ongoing emotional distress, feelings of powerlessness, and the loss of independence.

92.     As a direct result of OhioHealth's conduct, Ms. Hedrick has suffered extreme emotional distress; has suffered and endured recurrent meltdowns, embarrassment, humiliation, withdrawal, and lowered self-esteem; has suffered sleep loss; has had nightmares in October 2018 and March 2019 in which OHC threatens to and/or harms her service dog; and has lost her independence.

93.    Even with Rufus, Ms. Hedrick was not able to enter OHC independently in March 2019. She limited her daily visits with her father to times that Burkholder was available

CLAIMS FOR RELIEF

**First Claim – Title III of the Americans with Disabilities Act
42 U.SC. §§ 12181 et seq.**

94.    The Hedricks incorporate all preceding paragraphs as if fully rewritten herein.

95.    Sara Hedrick is a "qualified person with a disability" under 42 U.S.C. 12102(a)(A).

13

96.    Thomas Hedrick is a "person associated with a person with a disability" under 42 U.S.C. 12182(e)(2)(E).

97.    OHC is a "private entity" and a "public accommodation" under 42 U.S.C. §§ 12181(6) and (7)(f), respectively.

98.    There is a great likelihood that Thomas Hedrick will return to OHC for in-patient care.

99.    In the event, Mr. Hedrick needs to be hospitalized in the future he intends to return to OHC and Ms. Hedrick intends to visit him daily.  OHC is the healthcare provider the Hedricks choose to treat Mr. Hedrick because of its past provision of excellent healthcare and its expertise in stroke care.

100.   The ADA's Service Animal regulations require OHC to modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability. 28 CFR § 35.136(a).

101.   The ADA's Service Animal regulations require OHC to permit individuals with disabilities to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go. 28 CFR § 35.136(g).

102.   OHC denied Ms. Hedrick's the opportunity to participate in or benefit from its services, facilities, privileges, advantages, and accommodations that it provides to visitors.

103.   On April 2 and October 8, 2018, OHC directed Ms. Hedrick to remove her service dog from its facilities and told her not return with Rufus.

104.   Allowing Ms. Hedrick to remain and to visit with her father in VST and the Silver Units would not have fundamentally altered the nature of OHC's facility or the healthcare service it provides.

105.    OHC excluded Ms. Hedrick and her service dog from its intermediate care units without making an individual assessment as to whether the service dog posed a substantial and direct threat to health or safety.

106.    OHC excluded Ms. Hedrick and her service dog from its intermediate care units of its facilities where non-service animal handlers were freely allowed to enter and where OHC did not employ general infection-control measures such as those requiring strict hygiene rules and protective barriers like gloves, gowns, and masks.

107.    OHC discriminated against Ms. Hedrick and Mr. Hedrick solely on the basis of Ms. Hedrick's disability and Mr. Hedrick's association with Ms. Hedrick, by refusing to allow her to be accompanied by her service animal to visit with her father on the VST and Silver Unit, by directing to leave, by barring her from gaining access to father's room.

108.    There is a great likelihood unless enjoined that OHC will continue deny Ms. Hedrick access to its intermediate care units and floors.

109.    The Hedricks invoke the provisions of 42 U.S.C. § 12188(a)(2), and seek a temporary restraining order directing OHC to continue the Temporary Special Accommodation, described in Paragraph 79, until such time that OHC notifies this Court that it no longer requires prior notice to comply with the ADA.

110.    The Hedricks invoke the provisions of 42 U.S.C. § 12188(a)(2), and seeks a permanent injunction directing to OHC to:

      a.    Implement and publicize a single-subject Service Animal policy that tracks the Service Animal Rules of the ADA and addresses service animal etiquette.

      b.    Notify staff and employees of the Service Animal policy and OHC's obligations under the ADA;

c.      Implement an ongoing training regimen to educate OHC staff and new hires on the Service Animal policy, OHC's obligations under the ADA and service animal etiquette.

d.      Publicize its Service Animal Policy on its website and social media,

**Second Claim –Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794**

111.    The Hedricks incorporate all preceding paragraphs as if fully rewritten herein.

112.    OHC is a "program or activity" that "receives federal financial assistance" under 29 U.S.C. §§ 794(a) and (b)(3).

113.    OHC is a recipient of federal financial assistance because it has, inter alia, accepted Medicare and/or Medicaid.

114.    By these actions, OHC denied Ms. Hedrick meaningful access and an equal opportunity to  participate in and benefit from OHC's programs and activities in violation of Section 504 of the Rehabilitation Act.

115.    OHC discriminated against Ms. Hedrick and Mr. Hedrick solely on the basis of Ms. Hedrick's disability.

116.    Ms. Hedrick informed OHC that Rufus was a service animal on April 2 and October 8, but OHC refused to allow her to access her father in the intermediate care units.

117.    Ms. Hedrick and her advocates attempted to educate OHC about the rights of service animal users under the ADA. OHC failed and refused to reconsider April 2 and October 8 decisions to bar her access to visit with Mr. Hedrick.

118.    On April 2, 3, 4, 5, 6, 7, 8, 9 and October 8, 9, 10, 11, 12 and 13, 2018, OHC specifically excluded Ms. Hedrick because of her disability.

119.    OHC was deliberately indifferent to its obligations and the Hedricks' rights under the

ADA and the Rehabilitation Act.

## PRAYER FOR RELIEF

**WHEREFORE**, the Hedricks pray for judgment in their favor and against OHC as follows:

A.  A Declaratory Judgment finding that OHC violated specific requirements of Title III of the ADA and Section 504 of the Rehabilitation Act.

B.  A preliminary and permanent injunction enjoining OHC from further violations of the ADA, 42 U.S.C. § 12181 et seq., with respect to service animals and requiring OHC to educate and train its personnel to comply with the ADA.

C.  An award of compensatory and punitive damages, attorney's fees and litigation fees and costs;

D.  For prejudgment interest to the extent permitted by law; and

E.  For such other and further relief as this Court deems just and proper.

## JURY DEMAND

The Hedricks hereby demand trial by jury.

Dated: April 9, 2019

Respectfully submitted,

The Law Office of Rachel K. Robinson, LLC

*/s/ Rachel K. Robinson*
Rachel K. Robinson (0067518)
57 Jefferson Avenue, Suite G100
Columbus, Ohio 43215
Telephone: (614) 537-7553
Email:  rachel.robinson.law@gmail.com
***Trial Attorney for Plaintiffs Sara Hedrick and Thomas Hedrick***