**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Sara Hedrick,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:19-cv-1326** |
| | : | |
| **v.** | : | |
| | : | |
| **OhioHealth Corporation,** | : | **Judge Sargus** |
| | : | |
| **Defendant.** | : | **Chief Magistrate Judge Deavers** |

**MOTION OF DEFENDANT OHIOHEALTH CORPORATION**
**FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant OhioHealth Corporation respectfully moves this Court for judgment as a matter of law on all of Plaintiff Sara Hedrick's claims. The grounds for this motion are more fully set forth in the attached memorandum in support.

Respectfully submitted,

*/s/  Jeremy Hart*
M. J. Asensio (0030777), Trial Attorney
Jeremy Hart (0087744), Of Counsel
BAKER & HOSTETLER LLP
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
(614) 228-1541
(614) 462-2616 (facsimile)
masensio@bakerlaw.com
jhart@bakerlaw.com

*Attorneys for Defendant OhioHealth*
*Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 18, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Jeremy Hart*
Jeremy Hart

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Sara Hedrick, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:19-cv-1326 |
| | : | |
| v. | : | |
| | : | |
| OhioHealth Corporation, | : | Judge Sargus |
| | : | |
| Defendant. | : | Chief Magistrate Judge Deavers |

**MEMORANDUM IN SUPPORT OF DEFENDANT OHIOHEALTH CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

I.  INTRODUCTION ............................................................................................1

II.  FACTS ........................................................................................................2

III.  LAW AND ANALYSIS ............................................................................14

    A.  Summary Judgment Standard ................................................................14

Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Hogan v. Kokosing Constr. Co.*, 486 F. App'x 592, 592 (6th Cir. 2012); *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009) (quoting *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993); *Mullins v. U.S. Bank*, 296 F. App'x 521, 525 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

    B.  Section 504 of the Rehabilitation Act of 1973 ....................................15

29 U.S.C. §794(a); *Gohl v. Livonia Public Schools Dist.*, 836 F.3d 672, 681 (6th Cir. 2016); *Plautz v. Potter*, 156 F. App'x 812, 816-17 (6th Cir. 2005); *Sandison v. Michigan High School Athl. Assoc., Inc.*, 64 F.3d 1026, 1030-31 (6th Cir. 1995); *Yates-Mattingly v. Univ. of Cincinnati*, 2012 WL 3779934, *4 (S.D. Ohio Aug. 31, 2012); *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011); *Crocker v. Runyon*, 207 F.3d 314, 321 (6th Cir. 2000); *Burns v. City of Columbus, Dep't of Pub. Safety*, 91 F.3d 836, 841-42 (6th Cir. 1996); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315-16 (6th Cir. 2012) (en banc); *Mitchell v. Toledo Hosp*, 964 F.2d 577, 583 (6th Cir. 1992); *Carter v. Porter*, 2007 WL 9734145, *4 (S.D. Ohio March 8, 2007); *Horen v. Bd. of Educ. Of City of Toledo Pub. Sch. Dist.*, 655 F.Supp.2d 794, 802 and n.8 (N.D. Ohio Sept. 8, 2009); *Carlson v. Sunshine Villas HOA, Inc.*, 2018 WL 2317820, at *3 (M.D. Fla. May 22, 2018); *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).

    C.  Plaintiff's Claim That OhioHealth Discriminated Against Her In Violation of Section 504 of the Rehabilitation Act of 1973 In February 2018 Fails As A Matter of Law. ..................................................................................................18

*Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008); *Spokeo, Inc. v. Robins*, ---U.S.---, 136 S.Ct. 1540, 1548 (2016); *O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 904 (D. Ariz. 2012); *O'Connor v. Scottsdale Healthcare Corp.*, 582 F. App'x 695, 695-96 (9th Cir. 2014); *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001); *Hickey v. Chadick*, 649 F. Supp. 2d 770, 774 (S.D. Ohio 2009); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983); *Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990); *Upshaw v. Ford*, 576 F.3d 576, 586 (6th Cir. 2009); *Onyekelu v. Mercy Health Care Partners*, 2008 WL 4560770, at *4 (S.D. Ohio October 9, 2008); *Peacock v. Altercare of Canal Winchester Post-Acute Rehab. Ctr., Inc.*, 2011 WL 5075831, at *5 (S.D. Ohio October 26, 2011); *Joiner v. Ohio Dept. of Transp.*, 949 F. Supp. 562, 570 (S.D. Ohio 1996); *Manzer*, 29 F.3d at 1084; *Jones*, 488 F.3d at 407.

1. Plaintiff lacks standing to assert a claim concerning the alleged delay of entry into the Rehabilitation Hospital in February 2018. ......................19

    a. Plaintiff cannot establish a sufficient injury to convey standing for the February 2018 allegations. ...................................................19

    b. A favorable decision would not remedy Plaintiff's alleged injury stemming from the February 2018 allegations....................22

2. Plaintiff was not delayed from entering the Rehabilitation Hospital solely by reason of disability. ...................................................................25

D. Plaintiff's Claims That OhioHealth Intentionally Discriminated Against Her In Violation of Section 504 of the Rehabilitation Act of 1973 By Denying Her Access to the VTS Floor and the Pre-Operation Area at Riverside While Accompanied By Her Dog Fail as a Matter of Law. ..............................................28

*Smith v. Moorman*, 47 F. App'x 755, 757 (6th Cir. 2002); *Mitchell*, 964 F.2d at 583; *Carlson*, 2018 WL 2317820, at *3; *Gohl*, 836 F.3d at 683; *Wilson v. Cleveland Clinic Foundation*, 579 F. App'x 392, 400 (6th Cir. 2014); *Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 806 (6th Cir. 2007); *Russell v. Lew*, 549 F. App'x 389, 394 (6th Cir. 2013); *Jones*, 488 F.3d at 406; *Manzer* 29 F.3d at 1084; *Landefeld v. Marion General Hosp., Inc.*, 994 F.2d 1178, 1181 (6th Cir. 1993); *Burns*, 91 F.3d at 841-42; *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011).

1. Plaintiff cannot establish that she was denied access to the VTS floor on April 2 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination. .......................................................28

    a. Plaintiff cannot establish a prima facie case of discrimination concerning her April 2 denial of access allegations......................28

    b. OhioHealth had a legitimate, non-discriminatory reason to deny Plaintiff access to the VTS floor in the company of her dog on April 2, 2018. ...................................................................30

    c. OhioHealth's reasons for denying Plaintiff access to the VTS floor on April 2, 2018 were not pretext for discrimination............31

2. Plaintiff cannot establish that she was denied access to the pre-operation area on October 8, 2018 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination. ...................................33

    a. Plaintiff cannot establish a prima facie case of discrimination concerning her October 8 pre-operation area denial of access allegations. ...................................................................................33

b. OhioHealth had a legitimate, non-discriminatory reason to deny Plaintiff access to the pre-operation area in the company of her dog on October 8, 2018. .....................................................35

c. OhioHealth's reasons for denying Plaintiff access to the pre-operation area on April 2, 2018 were not pretext for discrimination. ...............................................................36

3. Plaintiff cannot establish that she was denied access to the VTS floor on October 8, 2018 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination. ........................................37

a. Plaintiff cannot establish a prima facie case of discrimination concerning her October 8 VTS unit denial of access allegations. ....................................................................37

b. OhioHealth had a legitimate, non-discriminatory reason to deny Plaintiff access to the VTS unit in the company of her dog on October 8. ..........................................................38

c. OhioHealth's reasons for denying Plaintiff access to the VTS floor on October 8 were not pretext for discrimination. ...............39

4. Plaintiff cannot establish that she was denied access to the VTS floor on April 3-9 or October 9-12, 2018 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination. ...................................41

E. Plaintiff's Claim That OhioHealth Discriminated Against Her In Violation of Section 504 of the Rehabilitation Act of 1973 By Delaying Her Access To Her Father In the Emergency Room On October 3, 2018 Fails As A Matter of Law. ..............................................................................43

*Tinch v. City of Dayton*, 77 F.3d 483 (6th Cir. 1996); *Lee*, 636 F.3d at 250.

F. Plaintiff's Claim That OhioHealth Failed to Accommodate Her Disability In Violation of Section 504 of the Rehabilitation Act of 1973 Fails As A Matter of Law. ..............................................................................45

*Alexander v. Choate,* 469 U.S. 287, 301 (1985); *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 575 (6th Cir. 1988); *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.,*119 F.3d 453, 461 (6th Cir. 1997); *Gantt v. Wilson Sporting Goods Co*., 143 F.3d 1042, 1046 n.4 (6th Cir. 1998); *Shaikh v. Lincoln Mem'l Univ*., 608 F. App'x 349, 353 (6th Cir. 2015); *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1035 (6th Cir. 1995); *Gohl*, 836 F.3d at 682; *Jones v. Sumser Retirement Village*, 209 F.3d 851, 854 (6th Cir. 2000); *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 n.4 (6th Cir. 2004); *Wisconsin Cmty. Svcs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (en banc); *Muhammad v. Court of Common Pleas of Allegheny*

*County, Pa.*, 483 F. App'x 759, 763 (3d Cir. 2012); *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 897-98 (7th Cir. 1999); *Tucker v. U.N.I.T.E.*, 407 F.3d 784 (6th Cir. 2005); *Hoff-Pierre v. University Hosp., Inc.*, 523 F. App'x 313 (6th Cir. 2013); *Tinch v. City of Dayton*, 77 F.3d 483 (6th Cir. 1996) (table); *Jones v. Univ. of Memphis*, 2016 WL 11496100, at *6 (W.D. Tenn. Sept. 9, 2016); *Gati v. W. Kentucky Univ.*, 762 F. App'x 246, 251 (6th Cir. 2019); *Waggoner v. Carlex Gless Am. LLC*, 682 F. App'x 412, 416 (6th Cir. 2017); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155 (5th Cir. 1996); *Chalmers v. Intel Corp*, 2014 WL 358989, at *4 (D. Ariz. Feb. 3, 2014); *Hurston v. Butler Cty. Dep't of Jobs & Family Servs.*, 2005 WL 2416566, at *8 (S.D. Ohio Sept. 30, 2005); *Edmunds v. Bd. of Control of E. Michigan Univ.*, No. 09-11648, 2009 WL 5171794, at *5 (E.D. Mich. Dec. 23, 2009); *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016); *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979); *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 678 F. Supp. 2d 576, 582-83 (E.D. Mich. 2009); *C.S. v. Ohio High Sch. Athletic Ass'n*, 2015 WL 4575217, at *7 (S.D. Ohio July 29, 2015); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001); *Smith & Lee Assoc., Inc. v. City of Taylor*, 102 F.3d 781, 795-96 (6th Cir. 1996); *Davis v. Echo Valley Condominium Assoc.*, 945 F.3d 483 (6th Cir. 2019); *Groner v. Golden Gate Apartments*, 250 F.3d 1039, 1046-47 (6th Cir. 2001); *Temple v. Gunsalus*, 1996 WL 536710, at *2 (6th Cir. Sept. 20, 1996) (per curiam); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001); *Doe v. Woodford Cty. Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000); *Pool v. Riverside Health Servs., Inc.*, 1995 WL 519129 (D. Kan. Aug. 25, 1995).

1.     Plaintiff did not plead that OhioHealth failed to accommodate her alleged disability and she is precluded from pursuing this theory of liability. ....................................................................................... 46

2.     Plaintiff never requested an accommodation. .............................. 49

    a.     Plaintiff never requested an accommodation on April 2 and OhioHealth did not unlawfully deny Ms. Burkholder's April 6 request. ........................................................................ 50

    b.     Plaintiff never requested an accommodation on October 8, 2020 ............................................................................ 53

3.     Even if Plaintiff requested that OhioHealth permit her to access VTS or the pre-operation area floor with her dog, the requested accommodation was not necessary for Plaintiff to participate in OhioHealth's patient visitation program .................................... 55

4.     Even if Plaintiff requested that OhioHealth permit her to be on the VTS floor or in the pre-operation area with her dog, her requested accommodation would fundamentally alter the nature of the services OhioHealth provides in those areas. .......................................... 58

5.     Even if Plaintiff requested that OhioHealth permit her to be on the VTS floor with her dog, her requested accommodation presented a direct threat to the health or safety of others .............................. 61

G.    Plaintiff Cannot Establish That OhioHealth Was Deliberately Indifferent to Her Federal Rights ................................................................................................63

*B.M. v. Bd. of Educ. of Scott Cty., Ky.*, 2008 WL 4073855, at *8 (E.D. Ky. Aug. 29, 2008); *Hill v. Bradley Cty. Bd. of Educ.*, 295 F. App'x 740, 743 (6th Cir. 2008); *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997); *R.K. ex rel. J.K. v. Bd. of Educ. Of Scott Cty., Ky.*, 755 F. Supp. 2d 800, 810 (E.D. Ky. 2010); *AP ex rel. Peterson v. Anoka-Hennepin Ind. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1147-48 (D. Minn. 2008); *Gallagher v. Pontiac School Dist.*, 807 F.2d 75, 80 (6th Cir. 1986); *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 290-91 (1998); *Bose v. Bea*, 947 F.3d 983, 989-990 (6th Cir. 2020); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348-49 (11th Cir. 2012); *Silberman v. Miami Dade Transit*, 927 F.3d 1127, 1135 (11th Cir. 2019); *Doe v. Sch. Bd. of Broward Cty., Fla*, 604 F.3d 1248, 1255 (11th Cir. 2010); *Welch v. City of Hartesville, Ala.*, 423 F. Supp. 3d 1277, 1284 (N.D. Ala. 2019); *K.K. ex rel. L.K. v. Pittsburgh Pub. Sch.*, 590 F. App'x 148, 153 (3d Cir. 2014); *Hill v. Bradley Cty. Bd. of Ed.*, 2007 WL 4124495, at *19 (E.D. Tenn. Nov. 19, 2007).

1.    Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights because Ms. Larry, Ms. Thompson, and OhioHealth's pre-operation area staff are not officials capable of creating liability on behalf of OhioHealth and Dr. Schuda was not deliberately indifferent toward Plaintiff's rights .........................................65

2.    Plaintiff cannot show that OhioHealth was deliberately indifferent toward her federal rights when it denied her access to the VTS unit and the pre-operation area in the company of her dog ..............................68

3.    Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights when it did not accommodate her by permitting her to access the VTS unit and the pre-operation area with her dog. ..............70

   a.    OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it refused to accommodate Plaintiff in April 2018 by permitting her on the VTS floor with her dog ........70

   b.    OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it refused to accommodate Plaintiff on October 8, 2018 by permitting her in the pre-operation area with her dog. ...................................................................................74

   c.    OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it refused to accommodate Plaintiff in October 2018 by permitting her on the VTS floor with her dog ....................................................................................................76

IV.    CONCLUSION ...............................................................................................77

## I.    INTRODUCTION

Plaintiff Sara Hedrick ("Plaintiff") claims that Defendant OhioHealth Corporation ("OhioHealth") discriminated against her solely by reason of her disability in violation of Section 504 of the Rehabilitation Act ("Section 504") when OhioHealth did not permit Plaintiff to access certain areas of OhioHealth Riverside Methodist Hospital ("Riverside") while accompanied by her service dog. Additionally, though Plaintiff did not plead a failure to accommodate claim, she now claims that OhioHealth failed to accommodate her disabilities in violation of Section 504. Plaintiff is wrong. OhioHealth neither intentionally discriminated against her solely by reason of her disability nor unlawfully failed to accommodate her.

Plaintiff, while accompanied by her dog, attempted to access two sensitive areas of Riverside. The first is a unit that cares for very ill patients, many of whom are required to be in isolation for the duration of their care. The second is the pre-operation area where all of Riverside's surgical patients are prepared for surgery. OhioHealth's infection prevention practitioners have determined that the existence of certain circumstances create an environment unsuitable for animal visitation given the unnecessary risk of infection. These circumstances are identified in OhioHealth's policies. The circumstances identified in OhioHealth's policies existed in the areas Plaintiff attempted to access with her dog and, as a result, Plaintiff was not permitted to bring her dog into either area in accordance with OhioHealth's policies in order to protect the safety of the patients in those areas. Plaintiff's inability to bring her dog into these areas had nothing to do with her alleged disabilities and everything to do with patient safety. As a result, this Court should grant summary judgment to OhioHealth on all of Plaintiff's claims.

## II.    FACTS

### A.  Thomas Hedrick's February 2018 Hospitalization

Plaintiff claims to have multiple psychological disabilities. (Deposition of Plaintiff, "Plaintiff Dep." p. 27).[1] Plaintiff uses a dog in an effort to mitigate the symptoms of her alleged disabilities.[2] (Second Amended Complaint "SAC," ¶11).

On February 22, 2018[3], Plaintiff's father, Thomas Hedrick ("Mr. Hedrick"), was admitted to OhioHealth Rehabilitation Hospital (the "Rehabilitation Hospital"). (SAC ¶19; Plaintiff Dep. p. 56). Mr. Hedrick received inpatient treatment at the Rehabilitation Hospital until his discharge on March 5. (Plaintiff Dep. p. 56).

Plaintiff, accompanied by her dog, went to the Rehabilitation Hospital to visit her father in late February 2018. (Plaintiff Dep. pp. 57-58). When Plaintiff entered the Rehabilitation Hospital's lobby to check in, the security guard asked Plaintiff for documents about her dog and told her that dogs were not permitted in the facility. (Plaintiff Dep. p. 57). Plaintiff told the security guard that her dog was a service dog, that he was permitted to be in the Rehabilitation Hospital, and that he could not ask for documentation concerning a service dog. (Plaintiff Dep. p. 57). The security guard restated his belief that no dogs were permitted in the Rehabilitation Hospital. (Plaintiff Dep. p. 57). Plaintiff reiterated that her dog was permitted. (Plaintiff Dep. p. 57). The security guard then checked Plaintiff in as a visitor and permitted her to enter with her dog. (Plaintiff Dep. p. 57). When Plaintiff arrived at her father's room, a nurse asked if she had documentation for her dog. (Plaintiff Dep. p. 58). Plaintiff told the nurse that the dog was a service dog. (Plaintiff Dep. p. 58). The nurse then permitted her to enter her father's room. (Plaintiff Dep. p. 58).

---

[1] Cited portions and exhibits from Plaintiff's Deposition are attached hereto as Exhibit A.
[2] For purposes of this motion, OhioHealth assumes without admitting that Plaintiff is disabled and that her dog is a service dog.
[3] Unless otherwise indicated, all dates herein occurred in 2018.

OhioHealth security personnel asked Plaintiff for her dog's documentation on two other occasions while Plaintiff was entering the Rehabilitation Hospital to visit her father. (Plaintiff Dep. p. 58-60). On each occasion, when Ms. Hedrick explained that the dog was her service dog, she was permitted to enter. (Plaintiff Dep. p. 58-60). Plaintiff was never excluded from or denied access to visit her father during his hospitalization at the Rehabilitation Hospital. (Plaintiff Dep. pp. 57, 59-60).

### B. Riverside's Vascular Thoracic Step-Down Unit

OhioHealth Riverside Methodist Hospital ("Riverside") is an OhioHealth member hospital. (SAC ¶6). With 28 inpatient care units and more than 1,000 inpatient beds, Riverside is a large and busy hospital. (*See* Deposition of Dr. Marian Schuda, "Schuda Dep." pp. 50-51).[4] One of the inpatient units at Riverside is the Vascular Thoracic Step-Down Unit ("VTS"). (Schuda Dep. pp. 97-98). VTS is an intermediate surgical nursing care unit located on the eighth floor of Riverside's Silver Tower and is sometimes referred to as "8 Silver." (*See* Plaintiff Dep. p. 63; Schuda Dep. p. 18). An "intermediate surgical nursing care unit" is a unit that cares for surgical patients and those sufficiently stable to be moved from the intensive care unit, but not yet well enough to be treated in a general hospital unit. (*See* Declaration of Andrea Thompson, "Thompson Dec." ¶ 5).[5]

As is evident from the unit's name, patients treated on VTS suffer from vascular and thoracic diseases and conditions including strokes, heart failure and other cardiac conditions, lung cancer and other lung conditions, and other serious medical conditions. (Thompson Dec. ¶ 3). VTS is designed and uniquely able to provide specialty care to patients suffering from these serious medical conditions. (Thompson Dec. ¶ 4). The physicians who perform rounds on VTS are specialists in vascular and thoracic care and the nurses who work on the unit are specially trained

---

[4] Cited portions and exhibits from Dr. Marian Schuda's Deposition are attached hereto as Exhibit B.
[5] Andrea Thompson's Declaration and its exhibits are attached hereto as Exhibit C.

in vascular and thoracic care. (Thompson Dec. ¶ 4). There is no other unit at Riverside dedicated to and uniquely equipped for providing specialty vascular and thoracic care. (Thompson Dec. ¶ 4). In large part due to the quality of the specialty care provided on VTS, Riverside has received awards from the American Heart Association/American Stroke Association for excellence in stroke treatment and became the first hospital in Ohio certified by the Joint Commission[6] as a Comprehensive Stroke Center. (*See* Declaration of Dr. Marian Schuda, "Schuda Dec." ¶ 3).[7]

The patients OhioHealth cares for on VTS are very sick. (Plaintiff Dep. p. 64; Schuda Dep. pp. 149-150). Patients on VTS frequently have large surgical wounds, chest tubes, and drains. (Schuda Dep. pp. 149-151). Many of the patients OhioHealth treats on the VTS floor suffer from conditions that require them to be in isolation for one or more reasons. (Schuda Dep. pp. 18, 139, 142, 150). When a patient is subject to isolation, special precautions must be taken to protect the isolated patient from inadvertently contracting a potentially life-threatening infection or spreading their infection to others. (Thompson Dec. ¶ 10).

### C. OhioHealth's Animal Visitation Infection Prevention Guidelines

One of the ways OhioHealth protects vulnerable patients, including those in isolation, from preventable infections and protects others from a contagious patient in isolation is by maintaining and enforcing a policy that regulates the areas of its hospitals in which animals of any kind may be present. (Schuda Dep. pp. 19, 111; Schuda Dep. Exs. C, H). This policy is called the Animal Visitation Infection Prevention Guidelines. (Schuda Dep. pp. 19, 111; Schuda Dep. Exs. C, H). The stated purpose of the Animal Visitation Infection Prevention Guidelines is to permit the use of animals to "enhance the return of patients to wellness and independence[]" while providing

---

[6] The Joint Commission is a healthcare accreditation body that certifies more than 22,000 health care organizations and programs throughout the United States in an effort to continuously improve public health care. *See* https://www.jointcommission.org/about-us/facts-about-the-joint-commission/joint-commission-faqs/
[7] Dr. Marian Schuda's Declaration and its exhibits are attached hereto as Exhibit D.

"[s]trict infection prevention guidelines . . . to provide a safe environment for animals, handlers, and patients." (Schuda Dep. Exs. C, H). Consistent with this purpose, OhioHealth's Animal Infection Prevention Guidelines provide infection prevention guidelines for non-service animals (such as comfort animals and therapy animals), pet visitation, and service animals. (Schuda Dep. Exs. C, H).

OhioHealth's Animal Visitation Infection Prevention Guidelines were developed by a group of OhioHealth's infection prevention experts. (Schuda Dep. pp. 19, 140; Schuda Dec. ¶ 5). When developing the Animal Visitation Infection Prevention Guidelines, the infection prevention experts considered the most up-to-date resources concerning the presence of animals in hospitals. (Schuda Dec. ¶ 5; Schuda Dep. Exs. C, H).

### D. OhioHealth's Visitation Program

During 2018, Riverside's general visiting hours were from 11:00 a.m. to 8:30 p.m. (SAC ¶90). Patients at Riverside, including those treated on the VTS floor, have the right to designate and receive visitors. (Schuda Dec. ¶ 6; Deposition of Kathy Hendricks, Ex. J, Patient Right No. 29).[8] OhioHealth allows patients to receive visitors so that a patient's loved ones have the opportunity to access them while they receive care. (Schuda Dec. ¶ 6). A patient's right to receive visitors is not unlimited. (Schuda Dec. ¶ 6). Receiving a visitor cannot violate any OhioHealth policy or compromise the patient's treatment or that of other patients. (Schuda Dec. ¶ 6). While OhioHealth's visitation program seeks to provide visitors access to patients during their treatment, it does not guarantee the quality of any visit. (Schuda Dec. ¶ 6). Hospital visits are often emotionally taxing on visitors who may experience stress, anxiety, and a wide array of other emotions during their visit. (Plaintiff Dep. pp. 201-202; Schuda Dec. ¶ 6).

---

[8] Cited portions and exhibits from Kathy Hendrick's Deposition are attached hereto as Exhibit E.

### E.  Thomas Hedrick's April 2018 Hospitalization

On April 2, Mr. Hedrick began receiving inpatient care on VTS at Riverside. (*See* Deposition of Thomas Hedrick, "T. Hedrick Dep." p. 64; T. Hedrick Dep. Ex. 7, p. 9; *see also* Plaintiff Dep. pp. 62-63).[9] Mr. Hedrick received treatment on the VTS floor because he had been hospitalized for stroke symptoms and diagnosed with, among other things, both heart abnormalities and a constricted carotid artery, which causes strokes. (T. Hedrick Dep. pp. 64-65; T. Hedrick Dep. Ex. 7, p. 1; Thompson Dec. ¶ 6). That same day, Plaintiff arrived on VTS to visit her father at approximately 3:55 p.m. (Plaintiff Dep. p. 66). When Plaintiff arrived on VTS, she was accompanied by her dog. (Plaintiff Dep. pp. 63, 67).

When Plaintiff entered her father's room, the nurse caring for her father, DaleShannon Larry, entered after her. (SAC ¶ 29; Plaintiff Dep. p. 67). Ms. Larry said to Plaintiff: "I'm sorry you can't have your dog here." (SAC ¶ 29; Plaintiff Dep. p. 69). Ms. Larry told Plaintiff that she could not have her dog on the VTS floor in an effort to protect vulnerable patients and in accordance with OhioHealth's applicable policy that prohibited animals in areas where patients were in isolation. (Declaration of DaleShannon Larry, "Larry Dec." ¶ 3).[10] Ms. Larry knew that there were patients in isolation receiving care on VTS at the time Plaintiff arrived on April 2. (Larry Dec. ¶ 3, 4). VTS nurses are informed of the number of patients in isolation on the unit before every shift in the safety huddle. (Thompson Dec. ¶¶ 10, 18; Larry Dec. ¶ 4).

Plaintiff responded that the dog was her service dog and that he was permitted to be on the VTS floor. (Plaintiff Dep. pp. 69-70). Plaintiff then asked why her dog was not allowed on the VTS floor. (Plaintiff Dep. p. 70). Ms. Larry responded that VTS was a "special unit." (Id.). Ms. Larry described the VTS floor to Plaintiff as a "special unit" because, pursuant to OhioHealth

---

[9] Cited portions and exhibits from Thomas Hedrick's Deposition are attached hereto as Exhibit F.
[10] DaleShannon Larry's Declaration is attached hereto as Exhibit G.

policy, unlike the many general hospital units at Riverside, no animals of any kind were permitted on the VTS unit because patients who were in isolation were receiving care on the unit. (*See* Larry Dec. ¶ 3; Declaration of Jessica Puchta, "Puchta Dec." ¶ 4; Thompson Dec. ¶¶ 8, 18).[11] The care provided to and condition of the patients treated on the VTS floor differentiates the unit from the many general hospital units at Riverside and make it "special." (Thompson Dec. ¶ 8; Larry Dec. ¶ 3; Puchta Dec. ¶ 4).

Ms. Larry then went to consult with her manager, Andrea Thompson, to confirm that Plaintiff could not have her dog on VTS. (Plaintiff Dep. pp. 70, 72; *see also* Larry Dec. ¶ 5). When asked by Ms. Larry if Plaintiff's dog was permitted to be present on VTS, Ms. Thompson referred to the Animal Visitation Infection Prevention Guidelines dated January 20, 2017 (the "2017 Infection Prevention Policy"). (Thompson Dec. ¶ 9; Schuda Dep. pp. 22; Schuda Dep. Ex. C). As Plaintiff had told Ms. Larry the dog was a "service dog," Ms. Thompson consulted the portion of the 2017 Infection Prevention Policy concerning service animals. (Thompson Dec. ¶ 9).

With regard to service animals, the 2017 Infection Prevention Policy generally provides that "[s]ervice animals that are accompanying visitors or patients with disabilities are permitted in the main lobby, cafeteria, visitor lounges, private offices, and, anywhere the patient or visitor would otherwise be allowed to go within the facility." (Schuda Dep. Ex. C, Section III.A.). The 2017 Infection Prevention Policy, however, also provides, in relevant part, that service animals "are not permitted in areas where any patient(s): 1. Are in isolation . . . ." (Schuda Dep. pp. 28-29; Schuda Dep. Ex. C, Section III.L.1). In 2018, OhioHealth's staff understood this provision to mean that animals—regardless of whether they were comfort animals, therapy animals, facility animals, or service animals—were not permitted on units where any patient was in isolation. (Schuda Dep.

---

[11] Jessica Puchta's Declaration is attached hereto as Exhibit H.

pp. 18, 137-139; Thompson Dec. ¶ 9; Larry Dec. ¶ 3; Puchta Dec. ¶ 5, 6). On April 2, there were nine patients on VTS in isolation. (Schuda Dec. ¶ 8, Ex. A).

Ms. Thompson also considered the safety of the other isolation patients being treated on VTS on April 2. (Thompson Dec. ¶ 11). Nine of the 32 patients receiving treatment on VTS on April 2 were in isolation. (Schuda Dec. ¶ 8, Ex. A). At the time of Plaintiff's April 2 visit to VTS, OhioHealth's infection prevention practitioners had determined that the presence of an animal in an area where any patient was in isolation presented an unacceptable risk of unintentional infection. (Schuda Dep. pp. 139-140; Schuda Dep. Ex. C). This judgement had been reviewed by OhioHealth's Infection Control Committee and approved by its Quality Committee. (Id.).

Consequently, when presented with Plaintiff's dog on VTS, Ms. Thompson had three choices: 1) transfer the patients in isolation to another area of the hospital and allow the dog to remain on the floor; 2) transfer Mr. Hedrick to another area of the hospital where other patients were not in isolation; or 3) require the dog to be removed from VTS. (Thompson Dec. ¶¶ 12, 15, 16). Ms. Thompson did not have the authority to transfer any patient off VTS to another hospital unit. (Thompson Dec. ¶ 12). As a result, to transfer the isolation patients off VTS, Ms. Thompson would have been required to: 1) identify a medically appropriate and properly equipped unit for each patient's transfer considering each patient's unique condition; 2) obtain confirmation from the unit that it had a bed for the patient; 3) obtain authorization for the transfer and new treatment orders from each transferring patient's physician; 4) inform each impacted patient of the transfer and reason for the transfer; and 5) request personnel to physically perform each patient's transfer. (Thompson Dec. ¶ 13).

It is VTS accepted practice not to move isolated patients from the unit unless ordered by a physician or it is medically necessary. (Thompson Dec. ¶ 14). This is because moving a patient

8

subject to isolation to another area of the hospital risks spreading the contagious infection from which the isolated patient suffers to other patients, staff, or visitors or contaminating other areas of the hospital or equipment. (Thompson Dec. ¶ 14). Mr. Hedrick was a stroke patient and could not receive the specialty care needed, and that his physician desired, if moved to another area of Riverside. (Thompson Dec. ¶ 15). The only option Ms. Thompson had at the time that would not alter Mr. Hedrick's care or that of other patients on VTS was to require Plaintiff to remove her dog. (Thompson Dec. ¶ 16). The reason Plaintiff's dog was not permitted on VTS on April 2 was, consistent with the 2017 Infection Prevention Policy, for the safety of the patients—particularly those in isolation—being treated on the unit. (Schuda Dep. p. 151; Thompson Dec. ¶ 11; Larry Dec. ¶ 3).

Ms. Larry told Plaintiff that her nurse manager confirmed that her dog was not permitted on VTS and that she needed to remove the dog. (Plaintiff Dep. p. 72). Plaintiff then left VTS with her dog. (Plaintiff Dep. pp. 67-68).

On April 3, Plaintiff again visited her father on VTS. (Plaintiff Dep. p. 78, 195-196). Plaintiff did not have her dog with her when she visited on April 3. (Plaintiff Dep. pp. 78-79). Plaintiff remained diagnosed with all of the same psychological conditions on April 3 that she had on April 2. (Plaintiff Dep. p. 78). During that visit, Plaintiff spoke to her father, was able to ascertain his condition and plan of treatment and tell her father that she loved him. (Plaintiff Dep. p. 196). Plaintiff agreed that it was a "normal" hospital visit. (Plaintiff Dep. p. 196).

On April 4, Gail Burkholder ("Ms. Burkholder") called Riverside about VTS's decision not to permit Plaintiff's dog on the unit on April 2. (SAC ¶ 36). Dr. Marian Schuda ("Dr. Schuda") returned Ms. Burkholder's telephone call. (Schuda Dep. pp. 68-69). Dr. Schuda is the Medical Director for Patient Services at Riverside. (Schuda Dep. p. 6). Dr. Schuda also serves as

Riverside's compliance officer concerning disability-related access issues under the Americans with Disabilities Act. (Schuda Dep. p. 31). As a result, Dr. Schuda answers complaints concerning disability-related access issues. (Schuda Dep. p. 32).

When Dr. Schuda spoke to Ms. Burkholder concerning Plaintiff, Ms. Burkholder identified herself as Mr. Hedrick's "sister" and Plaintiff's "aunt." (Schuda Dep. 59). Ms. Burkholder is not Mr. Hedrick's sister; she is not related to Mr. Hedrick or Plaintiff in any way. (T. Hedrick Dep. pp. 17, 116; Plaintiff Dep. pp. 11). Other than claiming to be a relative, Ms. Burkholder did not identify any other relationship she had with Plaintiff. (Schuda Dec. ¶ 10).

On Friday, April 6 at 1:32 p.m., Ms. Burkholder sent Dr. Schuda an email following up on their prior telephone conversation. (Schuda Dep. Ex. N). After attempting to summarize her prior conversation with Dr. Schuda, Ms. Burkholder stated: "I am formally asking for an accommodation for the family of Thomas Hedrick for the duration of his stay at Riverside Methodist Hospital's Vascular and Thoracic Surgery unit . . . to allow visitation by his daughter accompanied by her service dog." (Id.). Dr. Schuda sought advice from OhioHealth's Office of the General Counsel concerning her response to Ms. Burkholder's email and then responded on April 16. (Schuda Dep. p. 91; Schuda Dep. Ex. N). In her response, Dr. Schuda explained that in their prior conversations she had offered to provide hospital staff to assist Plaintiff to the extent necessary for her to visit her father on VTS without her dog or facilitate a review of Mr. Hedrick's clinical condition to determine if it was such that he could be moved to a hospital unit where dogs may be present. (Schuda Dep. Ex. N). Dr. Schuda concluded that the issue was, however, moot as Mr. Hedrick had already been discharged from Riverside. (Id.).

Mr. Hedrick was discharged from Riverside on Monday, April 9. (SAC ¶46). OhioHealth was treating patients in isolation on VTS during the entirety of Mr. Hedrick's April 2018

10

hospitalization. (Schuda Dec. ¶ 8, Ex. A). On average, 25% of all patients treated on VTS during Mr. Hedrick's April 2018 hospitalization were in isolation. (Schuda Dec. ¶ 8, Ex. A). After visiting Mr. Hedrick on April 3 without her dog, Plaintiff chose not visit Mr. Hedrick again during his April 2018 hospitalization on VTS. (Plaintiff Dep. p. 79).

### F. Thomas Hedrick's October 2018 Hospitalization

On October 3, Mr. Hedrick was transported to Riverside's Emergency Department by ambulance. (Plaintiff Dep. pp. 82-83; T. Hedrick Dep. pp. 82). Shortly after her father's arrival, Plaintiff and her dog arrived in the emergency room. (SAC ¶63). Halle Detwiler ("Ms. Detwiler"), a nurse in Riverside's emergency department, approached Plaintiff and asked whether her dog was a service animal required because of disability and what work or task her dog had been trained to perform. (SAC ¶63; Schuda Dep. Ex. F). Once Plaintiff answered those questions, Ms. Detwiler left and called Riverside's Risk Management Department to confirm that Plaintiff's dog could be in the Emergency Department and to check to ensure that Mr. Hedrick was settled and able to receive visitors. (Plaintiff Dep. p. 83; Schuda Dep. Ex. F: Declaration of Halle (Detwiler) Bullock, "Bullock Dec." ¶¶ 3, 4).[12] When Ms. Detwiler returned five-to-ten minutes later to tell Plaintiff she could see her father, Plaintiff was no longer in the Emergency Department. (Bullock Dec. ¶ 6). Detwiler learned that Plaintiff had gone to the Service Excellence Office and went there to find her. (Bullock Dec. ¶ 6, 7). When Ms. Detwiler found Plaintiff in the Service Excellence Office, Ms. Detwiler took her to her father's room in the Emergency Department. (Plaintiff Dep. p. 84-85; Schuda Dep. Ex. F; Bullock Dec. ¶ 7).

On October 8, Mr. Hedrick was scheduled for a carotid endarterectomy to clean out his carotid artery in an effort to prevent future strokes. (T. Hedrick Dep. pp. 83-85). Prior to Mr.

---

[12] Halle (Detwiler) Bullock's Declaration is attached hereto as Exhibit I.

Hedrick's surgery, he was taken to the pre-operation area to prepare him for his upcoming surgery. (SAC ¶67). Plaintiff and her sister, Tara Colon, went to the pre-operation waiting area. (*See* Deposition of Tara Colon, "Colon Dep." pp. 22-23).[13] OhioHealth staff informed Plaintiff and Ms. Colon that Plaintiff's dog was not permitted in the pre-operation area where Mr. Hedrick was being prepared for surgery. (Plaintiff Dep. p. 90-91; Colon Dep. p. 22). OhioHealth staff did not refer to Plaintiff's dog as a "service dog" and Plaintiff did not tell OhioHealth staff in the pre-operation area that she considered her dog a service dog or that she was disabled. (Plaintiff Dep. pp. 92-93). When the OhioHealth staff member informed Plaintiff that she could not take her dog into the pre-operation area, Plaintiff simply said "okay" because she did not want to argue. (Plaintiff Dep. pp. 92-93).

The pre-operation area at Riverside is an area of the hospital where patients are being prepared for surgery. (Schuda Dep. pp. 148-149). Patients receive intravenous therapy ("IV") and full skin preparation for surgery. (Schuda Dep. pp. 148-149). Anesthesiologists also administer regional nerve blocks in the pre-operation area. (Schuda Dep. pp. 148-149). On average, Riverside performs 21,000 surgeries a year and 90 surgeries per business day in 35 operating rooms, and all surgical patients are prepared for their operations in the same pre-operation area. (Schuda Dep. p. 50; Schuda Dec. ¶ 7). As a result, these procedures take place in the pre-operation area on a continuous basis. (Schuda Dec. ¶ 7). Placing of IVs, performing full skin preparation, and administering regional nerve blocks are all considered "significant procedures" under OhioHealth's 2018 Animal Visitation Infection Prevention Guidelines ("2018 Infection Prevention Policy"). (Schuda Dep. p. 117, Ex. H, Section III.H.3.).[14] Consequently, because

---

[13] Cited portions and exhibits from Tara Colon's Deposition are attached hereto as Exhibit J.
[14] From time-to-time, sterile procedures are also performed in the pre-operation area. (Schuda Dep. p. 117). When sterile procedures are in the pre-operation area, all people in the area must take precautions to prevent the spread of infectious disease by, among other things, wearing protective garments. (Schuda Dep. p. 115).

significant procedures constantly take place in the pre-operation area, in order to avoid infection and keep pre-surgical patients safe, no animals of any kind, whether service animal or otherwise, are permitted in the area. (Schuda Dep. pp. 149, 151).

When OhioHealth's staff informed Plaintiff that her dog was not permitted in the pre-operation area where patients were being prepared for surgery, Ms. Colon took Plaintiff's dog outside while Plaintiff visited with her father without her dog. (Plaintiff Dep. p. 93; Colon Dep. pp. 23-24). By Plaintiff's own account, her visit with her father in the pre-operation area on October 8 was normal. (Plaintiff Dep. pp. 196-197). Plaintiff wished her father a good surgery, told him she hoped to see him after the surgery was over, told him that she loved him, and jokingly warned him to "behave." (Plaintiff Dep. pp. 196-197).

Mr. Hedrick's surgery was successful. (T. Hedrick Dep. p. 89). Following Mr. Hedrick's operation, he was transferred to the VTS floor for post-surgical care. (T. Hedrick Dep. p. 87; Plaintiff Dep. p. 93; SAC ¶70). When Plaintiff was notified that her father's surgery had completed, she went to Riverside's guest services office and called him in his room on the VTS floor. (Plaintiff Dep. pp. 93-94). Plaintiff told Mr. Hedrick that she was coming up to the VTS floor, and he responded that she was not allowed to bring her dog with her. (Plaintiff Dep. pp. 93-94). Plaintiff asked to speak to Mr. Hedrick's nurse, who was Jessica Puchta ("Ms. Puchta"). (Plaintiff Dep. p. 94; SAC ¶72). Plaintiff told Ms. Puchta that her dog was her service dog and that she had "stuff" for her father, including his glasses, cell phone, and a clock. (Plaintiff Dep. pp. 95-96; SAC ¶73). Ms. Puchta explained that VTS was a "special unit" and that no dogs were permitted. (Plaintiff Dep. p. 94). Ms. Puchta called the VTS floor a "special unit" because, pursuant to OhioHealth policy, no animals of any kind were permitted on the VTS unit at that time because patients in isolation were receiving care on the unit. (Puchta Dec. ¶¶ 4, 5, 6; Thompson Dec. ¶¶

13

17, 18). Seven of the 32 patients being treated on VTS on October 8 were in isolation. (Schuda Dec. ¶ 9, Ex. B; *see also* Schuda Dep. p. 142). Permitting Plaintiff to bring her service animal on the VTS floor on October 8 would have violated OhioHealth's 2018 Infection Prevention Policy, which, in an effort to keep vulnerable patients safe, prohibits animals of any kind in "areas where any patients . . . [a]re in isolation." (Schuda Dep. pp. 140-143). As a result, Ms. Puchta met Plaintiff in the lobby to retrieve Mr. Hedrick's personal items from her. (Plaintiff Dep. pp. 94-97). Plaintiff chose not to visit Mr. Hedrick during the remainder of his October 2018 hospitalization on VTS. (Plaintiff Dep. p. 98).

### G. October 2018 to Present

Since Mr. Hedrick's discharge from Riverside on October 12, Plaintiff has accessed various OhioHealth facilities with her dog as a visitor and patient. (SAC ¶81). Specifically, Plaintiff has accessed OhioHealth facilities with her dog on the following dates: March 23-29, 2019; July 14, 2019; November 8, 2019; and January 3, 2020. (SAC ¶81).

## III.    LAW AND ANALYSIS

### A.  Summary Judgment Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may demonstrate the absence of a genuine issue of material fact by identifying that the non-moving party cannot prevail because he or she lacks sufficient evidence to support an essential element of his or her case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Hogan v. Kokosing Constr. Co*., 486 F. App'x 592, 592 (6th Cir. 2012). To survive summary judgment, "the non-moving party must present 'significant probative evidence' to show that there is more than 'some metaphysical doubt as to the material facts.'" *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009) (quoting *Moore v. Philip Morris Co*., 8 F.3d 335,

339-40 (6th Cir. 1993)). "A mere scintilla of evidence is insufficient; rather, 'there must be evidence on which the jury could reasonably find for' the non-moving party." *Mullins v. U.S. Bank*, 296 F. App'x 521, 525 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). As demonstrated below, this standard compels summary judgment in favor of OhioHealth.

### B.  Section 504 of the Rehabilitation Act of 1973

Plaintiff brings a single claim under Section 504 of the Rehabilitation Act of 1973 ("Section 504") alleging that she was excluded from participation or denied benefits of a federally funded program when she, accompanied by her dog, was not permitted to access the VTS floor at Riverside on various dates in April and October 2018 and the pre-operation area on October 8.

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States [as defined by the Rehabilitation Act], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. §794(a). Thus, to prevail on a Section 504 claim a plaintiff must prove four elements: 1) the plaintiff is a disabled person under the Rehabilitation Act; 2) the plaintiff is "otherwise qualified" for participation in the program; 3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of her disability; and 4) the program or activity receives federal financial assistance. *Gohl v. Livonia Public Schools Dist.*, 836 F.3d 672, 681 (6th Cir. 2016); *Plautz v. Potter*, 156 F. App'x 812, 816-17 (6th Cir. 2005); *Sandison v. Michigan High School Athl. Assoc., Inc.*, 64 F.3d 1026, 1030-31 (6th Cir. 1995).

Plaintiffs bringing Section 504 claims can prove their case directly or indirectly. *Gohl*, 836 F.3d at 682-83. Direct evidence of disability discrimination is a "smoking gun." *Id.* Such evidence "explains itself" and "does not require the fact finder to draw any inferences" to determine that, in the context of a Section 504 claim, the plaintiff's disability was the sole reason she was excluded from the federally funded program or its benefits or was otherwise discriminated against. *Id.*

Where no direct evidence of disability discrimination exists, a Section 504 plaintiff may prove her claim indirectly. *Gohl*, 836 F.3d at 682-83. To prove an indirect case of disability discrimination under Section 504, a plaintiff must meet the requirements of the familiar *McDonnell Douglas* test. *Id.* Thus, a plaintiff must first establish a prima facie case. Specifically, a plaintiff must show that: 1) she is disabled under the Rehabilitation Act; 2) she is "otherwise qualified" for participation in the program; 3) she is excluded from participation from, denied the benefits of, or otherwise discriminated against solely by reason of her disability; and 4) the program receives federal financial assistance. *Id.*

To satisfy the third element of a Section 504 prima facie case and establish that an action was taken solely by reason of her disability, a plaintiff must show that her disability was the *only* motivation for a defendant's challenged action. *Yates-Mattingly v. Univ. of Cincinnati*, 2012 WL 3779934, *4 (S.D. Ohio Aug. 31, 2012). Section 504's causation requirement is so stringent that the Sixth Circuit has repeatedly reiterated that "the Rehabilitation Act permits . . . a decision *because of* handicap if the handicap is not the sole reason for the decision." *See Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011); *Crocker v. Runyon*, 207 F.3d 314, 321 (6th Cir. 2000); *Burns v. City of Columbus, Dep't of Pub. Safety*, 91 F.3d 836, 841-42 (6th Cir. 1996). Thus, Section 504 sets a "higher bar" for causation than the ADA, which requires plaintiffs to prove only that the complained of action was taken *because of* an individual's disability. *Gohl*, 836 F.3d at

16

682; *see also Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315-16 (6th Cir. 2012) (en banc). Given this well-accepted causation standard, if OhioHealth's decision to deny Plaintiff access to any part of its facility in 2018 was in any way motivated by anything other than her disability, Plaintiff cannot establish a prima facie case of discrimination under Section 504.

Additionally, in an indirect case, the third factor's causation requirement "demands a showing that similarly situated non-protected [persons] were treated more favorably." *Gohl*, 836 F.3d at 683. The lack of similarly situated comparators dooms a plaintiff's indirect case. As the Sixth Circuit explained, "[t]he comparator requirement is the be all and end all of the circumstantial-evidence test. If there are no comparators, there is no way to deploy it." *Id.* For a comparator to be "similarly situated," they must be similarly situated in every relevant way. *Mitchell v. Toledo Hosp*, 964 F.2d 577, 583 (6th Cir. 1992) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority [individuals], the plaintiff must show that the 'comparables' are similarly-situated *in all respects*.") (emphasis in original); *Carter v. Porter*, 2007 WL 9734145, *4 (S.D. Ohio March 8, 2007) (comparables must be similarly situated in "every relevant way"). In *Horen v. Bd. of Educ. Of City of Toledo Pub. Sch. Dist.*, 655 F.Supp.2d 794, 802 and n.8 (N.D. Ohio Sept. 8, 2009) (applying similarly situated standard in the Section 504 disability discrimination context); *Carlson v. Sunshine Villas HOA, Inc.*, 2018 WL 2317820, at *3 (M.D. Fla. May 22, 2018) (recognizing that the appropriate similarly situated non-handicapped comparators in a Fair Housing Act emotional support dog case in which the plaintiff was not permitted to have her dog in her apartment were those who had been permitted "to keep pets on the property while [plaintiff's] request for a service dog was denied").

If a plaintiff satisfies those requirements, the defendant has the burden to produce a "legitimate, non-discriminatory" reason for its actions. *Id.*

If the defendant produces one or more such reasons, the plaintiff must show that each of them is mere pretext for discrimination. *Gohl*, 836 F.3d at 682-83. To demonstrate pretext, a plaintiff must prove that the defendant's legitimate, non-discriminatory reasons for the challenged action: 1) have no basis in fact; 2) were not the actual reasons for the challenged action; or 3) are insufficient to explain the challenged action. *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007). To demonstrate that a defendant's proffered reasons for the challenged action have no basis in fact, a plaintiff must produce evidence that the defendant's reasons never happened, that they are factually false. *Jones*, 488 F.3d at 406. To demonstrate that a defendant's proffered reasons for a challenged action were not the actual reasons, a plaintiff accepts that the defendant's proffered reasons for the challenged action *could* motivate the action, but must show "circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Finally, to demonstrate that a defendant's proffered reasons for a challenged action are insufficient to justify the action, a plaintiff must show that similarly situated individuals were treated more favorably. *Jones*, 488 F.3d at 407. "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).

**C. Plaintiff's Claim That OhioHealth Discriminated Against Her In Violation of Section 504 of the Rehabilitation Act of 1973 In February 2018 Fails As A Matter of Law.**

Plaintiff claims that OhioHealth violated Section 504 in February 2018 because its security personnel and a nurse asked her for documentation concerning her dog and, as a result, allegedly delayed her entry into the Rehabilitation Hospital. (Plaintiff Dep. p. 235). Plaintiff's February 2018 claim fails for two reasons. First, Plaintiff lacks standing to assert this claim. Second, even

18

if Plaintiff has standing to assert this claim, by Plaintiff's own admission, OhioHealth's personnel did not delay her solely because of her disability.

1. *Plaintiff lacks standing to assert a claim concerning the alleged delay of entry into the Rehabilitation Hospital in February 2018.*

Article III standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* Standing has three elements. "First, the plaintiff must have suffered in 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Additionally, the injury must be "fairly traceable to the challenged action of the defendant." *Id.* Finally, it must be likely that the injury will be "redressed by a favorable decision." *Id.* at 561. The party invoking federal jurisdiction has the burden of proving its standing. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008). Here, Plaintiff lacks standing to assert a claim concerning her alleged delayed entry into the Rehabilitation Hospital in February 2018 because she has established neither a sufficient injury in fact to convey standing nor that a favorable decision would remedy any alleged injury.

a. Plaintiff cannot establish a sufficient injury to convey standing for the February 2018 allegations.

A plaintiff cannot establish a sufficient injury in fact for purposes of establishing standing if the alleged injury is not both particularized and concrete. *Spokeo, Inc. v. Robins*, ---U.S.---, 136 S.Ct. 1540, 1548 (2016). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* An injury is concrete when it actually exists, meaning that the injury is real and not abstract. *Id.*

19

Neither this Court nor the Sixth Circuit have decided whether the momentary delay caused by a request for documentation about a dog entering a healthcare facility is sufficiently particularized and concrete to establish standing, but other courts have. In *O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 904 (D. Ariz. 2012), a case decided under the Americans with Disabilities Act ("ADA"), the court held that the brief delay experienced by the plaintiff when hospital security personnel asked her to register her service dog was insufficient to confer Article III standing.

*O'Connor* is directly on point. In *O'Connor*, the plaintiff entered the hospital with her service dog to visit her mother and was stopped by a hospital security guard. *O'Connor*, 871 F. Supp. 2d at 900. The security guard asked plaintiff is she had registered her dog, and plaintiff answered that she was not required to and would not register her dog. *Id.* at 901. The security guard re-asserted that plaintiff needed to register her dog and asked when the dog was last vaccinated and groomed. *Id.* When the guard continued to insist that the plaintiff register her dog, she told him that his demands were illegal. The security guard threatened to call the police and have the plaintiff arrested for trespassing if she did not register her dog. *Id.* When the plaintiff refused to leave the hospital, the security guard asked her to go outside and wait while he consulted with his supervisor. *Id.* After some time, the original security guard rejoined the plaintiff with two other guards and the hospital's head of security. *Id.* The head of security asked the plaintiff if she was disabled and if her dog was a service dog. *Id.* Plaintiff answered "yes" to both questions and was permitted to enter the hospital without registering her dog. *Id.*

Ruling on the plaintiff's failure to accommodate claim under Title III of the ADA, the court found that the plaintiff "suffered only a brief delay before the hospital allowed her to enter without registering . . . her service dog." *O'Connor*, 871 F.Supp.2d at 904. Citing the "ancient maxims of

20

*de minimus non curat lex* and *lex non curat de minimis*" which "teach that the law cares not about trifles," the court held that "the short delay caused by the encounter was too minor an injury to confer standing under the ADA." *Id.* (quoting *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839-40 (9th Cir. 2007)). On appeal, the Ninth Circuit affirmed stating: "The district court properly dismissed O'Connor's ADA claim because O'Connor failed to allege a concrete and particularized injury-in-fact traceable to defendants' conduct in delaying O'Connor's access to a hospital's premises with her service dog." *O'Connor v. Scottsdale Healthcare Corp.*, 582 F. App'x 695, 695-96 (9th Cir. 2014).

Here, just as in *O'Connor*, Plaintiff has failed to establish a sufficiently particularized and concrete injury to give rise to Article III standing for her February 2018 allegations. Taking the facts in the light most beneficial to Plaintiff, she was delayed momentarily on three occasions by OhioHealth's security personnel when entering the Rehabilitation Hospital and on one occasion by a nurse when entering her father's room. (SAC ¶20; Plaintiff Dep. pp. 56-60). In each instance, however, when she told OhioHealth's personnel that her dog was a service dog, they permitted her to access the Rehabilitation Hospital generally and her father's room specifically. (Id.). The momentary delays experienced by Plaintiff when entering and navigating the Rehabilitation Hospital—even if aggregated—were far shorter that the delay experienced by the *O'Connor* plaintiff who engaged in an extensive discussion with the hospital's security guard and was made to wait outside the hospital while the officer consulted with his superior. *See O'Connor*, 871 F.Supp.2d at 900-01. Consequently, just as in *O'Connor*, Plaintiff has failed to allege a sufficient injury to establish standing, and her February 2018 claim must be dismissed.

b. <u>A favorable decision would not remedy Plaintiff's alleged injury stemming from the February 2018 allegations.</u>

Even if Plaintiff can establish a sufficient injury for purposes of standing, her injury is not redressable by a favorable decision from this Court. This is so because Plaintiff has waived her claim to monetary damages for this claim, and she has neither pled nor can she establish entitlement to injunctive relief.

Plaintiff has expressly waived any claim for money damages in connection with her February 2018 allegations. In her deposition, Plaintiff testified as follows:

Q:    Ms. Hedrick, are you seeking—you testified that you believe that OhioHealth violated the Rehabilitation Act in February of 2018, do you remember that?

A:    Yes.

Q:    Are you seeking damages for that alleged violation?

A:    No.

(Plaintiff Dep. p. 245). Consequently, if Plaintiff cannot satisfy the standing requirements for seeking equitable relief, she has no standing to pursue her claim concerning February 2018.

Initially, Plaintiff cannot seek equitable relief with regard to her February 2018 claim because she did not plead it. Plaintiff's SAC never alleges that OhioHealth violated Section 504 in February 2018. Indeed, her allegations of unlawful conduct are limited to events in April and October 2018. (SAC ¶¶83, 105). Plaintiff testified that the dates set forth in her SAC are the only dates on which she claims OhioHealth violated Section 504. (Plaintiff Dep. 122-123). Plaintiff has not pled a claim with regard to February 2018 let alone sought equitable relief for such a claim.[15] Consequently, a favorable decision from this Court cannot redress Plaintiff's alleged injury from

---

[15] Plaintiff's only mention of a claim relating to February 2018 was in response to her attorney's prompting on direct examination. (Plaintiff Dep. p. 235).

February 2018 and her claim must be dismissed. Nevertheless, Plaintiff cannot show the necessary prerequisites to establish standing to seek equitable relief for her February 2018 allegations.

A plaintiff seeking declaratory and injunctive relief must show "actual present harm" or a "significant possibility of future harm." *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001). Being exposed to illegal conduct in the past is not, without more, sufficient to establish that the injury is redressable by equitable relief. *See Hickey v. Chadick*, 649 F. Supp. 2d 770, 774 (S.D. Ohio 2009). Any asserted future harm must be almost certain to occur and not speculative. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (holding that plaintiff lacked standing to seek declaratory and injunctive relief absent a showing that it was likely that he would again be stopped by police and placed in a chokehold); *Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990) (injury must be "certainly impending"); *Grendell*, 252 F.3d at 833 (declaratory judgment inappropriate where threat of future injury depended "on a string of actions the occurrence of which is merely speculative"). Plaintiff can show neither actual present harm nor a significant possibility of future harm.

Plaintiff admits that there is no actual present harm. Plaintiff testified at her deposition as follows:

Q:    And it's been about twenty-one months since October 8th, 2018, correct?

A:    Yes.

Q:    And you're not alleging that there is continuous or ongoing discrimination against you on behalf of OhioHealth, correct?

A:    Correct.

(Plaintiff Dep. p. 116).

Similarly, Plaintiff cannot show a significant possibility of future harm at the Rehabilitation Hospital. As Plaintiff testified, there has been no ongoing harm by OhioHealth since October 8 at

any of its facilities. (Id.). What is more, since that date, Plaintiff has been present in various OhioHealth facilities as a visitor or patient in the company of her dog on at least four occasions without any concerns. (SAC ¶81; Plaintiff Dep. p. 116).

Though Plaintiff generally alleges that "Mr. Hedrick relies on OHC for his emergency and inpatient healthcare" and that "[h]e intends to return to OHC for his future in-patient healthcare needs," such a general allegation is insufficient to establish the significant possibility of future harm necessary for Plaintiff to pursue a claim concerning the alleged February 2018 events at the Rehabilitation Hospital. (SAC ¶18). This is true for two reasons. First, Plaintiff's allegation in the SAC concerns Mr. Hedrick's general intention, but there is no evidence in the record that Mr. Hedrick intends to return to the Rehabilitation Hospital in the future. Second, and more significantly, any alleged possibility of future harm associated with Mr. Hedrick's potential return to the Rehabilitation Hospital is purely speculative. Mr. Hedrick cannot choose to return to the Rehabilitation Hospital as a patient. (Schuda Dec. ¶ 11). To be admitted to the Rehabilitation Hospital, a patient must both satisfy detailed functional, medical, and psycho-social admission criteria and be referred by a physician, nurse practitioner, or social worker. (Schuda Dec. ¶ 11). It is pure speculation for Plaintiff to assert that her father will return to the Rehabilitation Hospital in the future as she has no way of knowing whether her father will meet the applicable admission criteria or receive the needed referral. Alleged future harm that is merely speculative is insufficient to establish standing. *Grendell*, 252 F.3d at 833 (declaratory judgment inappropriate where threat of future injury depended "on a string of actions the occurrence of which is merely speculative").

In light of Plaintiff's own experience at OhioHealth's facilities since October 8, and the purely speculative nature of any alleged future injury or harm that she may suffer at the Rehabilitation Hospital, Plaintiff cannot demonstrate a significant likelihood of future harm there

24

and thus lacks standing to pursue her claim related to February 2018. Plaintiff's February 2018 claim must therefore be dismissed.

2. *Plaintiff was not delayed from entering the Rehabilitation Hospital solely by reason of disability.*

If Plaintiff does have standing to pursue a claim concerning the alleged events at the Rehabilitation Hospital in February 2018, her claim still fails as a matter of law. Plaintiff has no direct evidence that the Rehabilitation Hospital security personnel or nurse delayed her entry into the facility or her father's room on account of her disability. As a result, Plaintiff must prove her claim via circumstantial evidence. This she cannot do. Initially, Plaintiff cannot prove a prima facie case of discrimination because she cannot show that either the Rehabilitation Hospital security personnel or the nurse delayed her entry solely by reason of her disability. Even if she could establish a prima facie case, OhioHealth has a legitimate, non-discriminatory reason for the delay: It's personnel mistakenly, but in good faith, believed that no dogs were permitted in the Rehabilitation Hospital without documentation. (Plaintiff Dep. p. 57-60). Additionally, Plaintiff cannot show OhioHealth's legitimate non-discriminatory reason to have been pretext for discrimination.

Initially, Plaintiff's prima facie case fails because she cannot show that she was discriminated against by anyone at the Rehabilitation Hospital solely by reason of her disability. According to Plaintiff, when she entered the lobby of the Rehabilitation Hospital on three occasions, OhioHealth's security personnel asked her for documentation for her dog and told her dogs were not allowed in the facility. (Plaintiff Dep. pp. 57-60). With regard to the first alleged delay of access, Plaintiff testified that the security personnel said: "No dogs are allowed in here." (Plaintiff Dep. p. 57). However, in all three alleged instances of delay, when informed by Plaintiff that her dog was her "service dog," she was permitted to enter. (Plaintiff Dep. pp. 57, 59-60). The

25

same is true of the alleged delay by Plaintiff's father's nurse. While the nurse initially told Plaintiff she could not enter her father's room and asked for documentation about her dog, once Plaintiff told the nurse that her dog was a "service dog," the nurse permitted her to enter her father's room. (Plaintiff Dep. p. 58).

Plaintiff's account of the events shows that she was delayed not solely by reason of her disability, but because she was accompanied by a dog. However, once it became clear to OhioHealth's personnel that Plaintiff's dog was a service dog, they allowed her to enter both the Rehabilitation Hospital and Plaintiff's father's room. If OhioHealth's personnel were discriminating against Plaintiff solely by reason of her disability, the fact that Plaintiff considered her dog a "service dog" would have been immaterial to them. Consequently, Plaintiff cannot make out a prima facie case of discrimination concerning the alleged delayed entry at the Rehabilitation Hospital.

Even if Plaintiff can show that she was delayed by the Rehabilitation Hospital staff solely by reason of her disability, any delay experienced by Plaintiff was due to a legitimate, non-discriminatory reason: the Rehabilitation Hospital personnel mistakenly, but in good faith, believed that no dogs were permitted in the Rehabilitation Hospital without documentation. (Plaintiff Dep. p. 57-60). This reason is highlighted by the fact that, according to Plaintiff, three security personnel and one nurse held the same mistaken belief. (Id.). The Sixth Circuit has held that an admitted mistake in the application of a policy is a legitimate, non-discriminatory reason for a challenged action. *See Upshaw v. Ford*, 576 F.3d 576, 586 (6th Cir. 2009) (employer's mistake in application of promotion policy, not known by employer until discovery, constituted legitimate, non-discriminatory reason for failure to promote plaintiff); *Onyekelu v. Mercy Health Care Partners*, 2008 WL 4560770, at *4 (S.D. Ohio October 9, 2008) (employer's reason for

challenged action—that a communication was mistaken—was legitimate, non-discriminatory reason). The key issue is not whether the basis for a challenged decision was wrong or mistaken, but whether it was motivated by discriminatory animus. *See Peacock v. Altercare of Canal Winchester Post-Acute Rehab. Ctr., Inc.*, 2011 WL 5075831, at *5 (S.D. Ohio October 26, 2011). There is no evidence here that OhioHealth's personnel, even if mistaken in their understanding of a dog's ability to access the Rehabilitation Hospital, delayed Plaintiff because of discriminatory animus.

Plaintiff cannot show that OhioHealth's legitimate, non-discriminatory reason for the delays she allegedly experienced at the Rehabilitation Hospital is pretext for discrimination. Initially, Plaintiff cannot show that OhioHealth's reason has no basis in fact: Plaintiff testified and thus does not dispute that three security personnel and one nurse held the same mistaken belief— that dogs were not permitted in the Rehabilitation Hospital and that she was permitted entrance when she explained that her dog was a service dog. (Plaintiff Dep. pp. 57-60). *See Joiner v. Ohio Dept. of Transp.*, 949 F. Supp. 562, 570 (S.D. Ohio 1996) (plaintiff could not show pretext where he did not dispute the events underlying defendant's proffered reason for the challenged action). Additionally, Plaintiff cannot show that OhioHealth's reason was not the real reason for her delay. She can point to no "circumstances that tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084. Indeed, the willingness of OhioHealth's personnel to reverse their initial position and permit Plaintiff to access the Rehabilitation Hospital accompanied by her dog when informed that Plaintiff's dog was a service dog leads to the opposite conclusion—that discriminatory animus played no part in the delay. Finally, Plaintiff cannot show that OhioHealth's non-discriminatory reason was insufficient to explain the alleged delays because she cannot point to any other nondisabled person accompanied

by a dog who was not delayed when attempting to enter the Rehabilitation Hospital. *Jones*, 488 F.3d at 407. Consequently, even if Plaintiff has standing to pursue her claim related to her February 2018 visits to the Rehabilitation Hospital, her claim fails as a matter of law.

> **D. Plaintiff's Claims That OhioHealth Intentionally Discriminated Against Her In Violation of Section 504 of the Rehabilitation Act of 1973 By Denying Her Access to the VTS Floor and the Pre-Operation Area at Riverside While Accompanied By Her Dog Fail as a Matter of Law.**

Plaintiff's claims that OhioHealth unlawfully denied her access to the VTS floor in April and October 2018 and the pre-operation area on October 8 also fail as a matter of law. Plaintiff lacks direct evidence that she was denied access to the VTS floor or the pre-operation area because of her disability and thus must prove her claim via circumstantial evidence. Plaintiff can neither establish a prima facie case of discrimination nor rebut OhioHealth's legitimate, non-discriminatory reason for denying her dog access to the VTS floor and the pre-operation area.

> 1. *Plaintiff cannot establish that she was denied access to the VTS floor on April 2 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination.*

>> a. <u>Plaintiff cannot establish a prima facie case of discrimination concerning her April 2 denial of access allegations.</u>

Plaintiff cannot establish a prima facie case of disability discrimination under Section 504 because she cannot show that OhioHealth denied her access to the VTS floor solely by reason of her disability as Section 504 requires. According to Plaintiff, when she entered her father's room on the VTS floor on April 2, her father's nurse—Ms. Larry—said: "I'm sorry you can't have your dog here." (SAC ¶ 29; Plaintiff Dep. p. 69). Ms. Larry told Plaintiff that she could not have her dog on the VTS floor because the floor had several patients in isolation and in reliance on the 2017 Infection Prevention Policy, which prohibited all animals in areas where patients were in isolation (like the VTS unit) for the protection of those patients. (Larry Dec. ¶¶ 3, 5). Thus, Ms. Larry's initial communication to Plaintiff that her dog was not permitted on the VTS floor had nothing to

do with Plaintiff's disability and everything to do with patient safety. (Larry Dec. ¶¶ 3, 5). Plaintiff cannot dispute Ms. Larry's reason for telling her she could not have her dog on the VTS floor.

When Plaintiff asked why she could not have her dog on the VTS floor, Ms. Larry responded that VTS was a "special unit." (Plaintiff Dep. p. 70). Plaintiff testified that no one at OhioHealth gave her any other explanation for why her dog could not be on the VTS floor or what it meant that the VTS floor is a "special unit." (Plaintiff Dep. pp. 116-117). Plaintiff cannot dispute that Ms. Larry described the VTS unit to her as a "special unit" because, unlike the many general hospital units at Riverside, no animals of any kind were permitted on the VTS unit as patients who were in isolation were receiving care on the unit. (Larry Dec. ¶ 3; Puchta Dec. ¶ 4; Thompson Dec. ¶ 8). Thus, Ms. Larry's description of the VTS floor as a "special unit" is not evidence that Plaintiff was denied access to the VTS unit solely by reason of her disability. On the contrary, it demonstrates that Plaintiff's exclusion from the VTS unit had nothing at all to do with her disability, but everything to do with Ms. Larry's desire to ensure the safety of the patients treated on the VTS floor and comply with OhioHealth's 2017 Infection Prevention Policy. (Larry Dec. ¶¶ 3, 5, 6; Schuda Dep. pp. 32-33; 137-140; 150-151). Denying a service dog access to a healthcare facility for reasons other than that the plaintiff had a disability does not violate Section 504. *See Smith v. Moorman*, 47 F. App'x 755, 757 (6th Cir. 2002) (affirming district court's grant of summary judgment in ADA Title II case were the evidence showed that "disability played no part in the decision to prohibit Smith's dog from staying with him during his hospitalization").

That Plaintiff was not denied access to the VTS floor on April 2 solely by reason of her disability is highlighted by the fact that Plaintiff was permitted to access the VTS floor and visit her father without her dog on April 3. It is undisputed that Plaintiff visited her father on the VTS floor on April 3 without her dog. (Plaintiff Dep. pp. 78-79). It is also undisputed that on April 3,

Plaintiff had all of the same disabilities that she had on April 2. (Id.). Yet, on April 3, Plaintiff was not denied access to the VTS floor. (Id.). It is also undisputed that VTS was under Ms. Thompson's management for the entirety of Mr. Hedrick's April 2018 hospitalization. (Thompson Dec. ¶ 6). Consequently, Plaintiff's ability to access the VTS floor on April 3 without her dog while the floor was under Ms. Thompson's management demonstrates that she was not denied access to the floor on April 2 solely by reason of her disabilities.

What is more, Plaintiff has failed to identify any similarly situated comparators who received better treatment than her. That is, Plaintiff has identified no non-disabled individual who was permitted to access the VTS floor with an animal. *See Mitchell*, 964 F.2d at 583 ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority [individuals], the plaintiff must show that the 'comparables' are similarly situated *in all respects*."); *Carlson*, 2018 WL 2317820, at *3 (similarly situated comparators in case in which plaintiff was not permitted to have her dog in her apartment were those who had been permitted "to keep pets on the property while [plaintiff's] request for a service dog was denied"). In the absence of such comparator evidence, Plaintiff cannot establish a prima facie case of discrimination under Section 504. *Gohl*, 836 F.3d at 683. Plaintiff lacks the required comparable evidence.

Plaintiff therefore cannot establish a prima facie case of discrimination under Section 504 with respect to April 2 because the undisputed facts demonstrate that Plaintiff was not denied access to the VTS floor "solely by reason" of her disabilities.

b. OhioHealth had a legitimate, non-discriminatory reason to deny Plaintiff access to the VTS floor in the company of her dog on April 2, 2018.

Even if Plaintiff could prove a prima facie case of disability discrimination with regard to the April 2 denial of access to the VTS floor—which she cannot—OhioHealth denied Plaintiff

access for a legitimate, non-discriminatory reason: OhioHealth's personnel were seeking to ensure the safety of the patients receiving treatment on the VTS floor—especially the patients in isolation—and to adhere to its 2017 Infection Prevention Policy. (Schuda Dep. pp. 151; Larry Dec. ¶¶ 3, 4, 5, 6; Thompson Dec. ¶¶ 9, 10, 11). The Sixth Circuit has held that protecting patient safety and following internal policies are legitimate, non-discriminatory reasons for engaging in a challenged action. *See Wilson v. Cleveland Clinic Foundation*, 579 F. App'x 392, 400 (6th Cir. 2014) (enforcement of policy concerning patient safety legitimate, non-discriminatory reason for employee's discharge); *Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 806 (6th Cir. 2007) (patient safety legitimate, non-discriminatory reason for investigation of physician's practice); *Russell v. Lew*, 549 F. App'x 389, 394 (6th Cir. 2013) (adherence to internal policy is a legitimate, non-discriminatory reason for discharge of employee).

c. OhioHealth's reasons for denying Plaintiff access to the VTS floor on April 2, 2018 were not pretext for discrimination.

Plaintiff cannot show OhioHealth's legitimate, non-discriminatory reasons for denying her access to the VTS floor in the company of her dog on April 2 to be pretext for discrimination. To demonstrate that OhioHealth's proffered reasons for its exclusion of Plaintiff from the VTS floor on April 2 while accompanied by her dog have no basis in fact, Plaintiff must produce evidence that OhioHealth's proffered reasons never happened, that they are factually false. *Jones*, 488 F.3d at 406. This Plaintiff cannot do. Plaintiff cannot dispute that there were nine patients in isolation on the VTS floor on April 2. (Schuda Dec. ¶ 8, Ex. A). Nor can Plaintiff dispute that the 2017 Infection Prevention Policy prohibits all animals, including service dogs, from units where any patients are in isolation and from intermediate care units, like VTS. (Schuda Dep. pp. 28-29; Schuda Dep. Ex. C, Section III.L.1).

31

To demonstrate that OhioHealth's proffered reasons for its exclusion of Plaintiff from the VTS floor on April 2 while accompanied by her dog were not the actual reasons for her exclusion, Plaintiff must show that it is more likely a discriminatory reason motivated Plaintiff's exclusion from the VTS floor than the reasons offered by OhioHealth. *Manzer* 29 F.3d at 1084. Plaintiff cannot make this showing. There is no evidence that OhioHealth's personnel denied Plaintiff access to the VTS floor on April 2 for any reason other than their concern for patient safety given the presence of Plaintiff's dog and the presence of a significant number of isolation patients on the floor and their desire to comply with the 2017 Infection Prevention Policy.

Finally, to demonstrate that OhioHealth's proffered reasons for its exclusion of Plaintiff from the VTS floor on April 2 while accompanied by her dog were insufficient to explain her exclusion, Plaintiff must show that similarly situated individuals seeking to access the VTS floor were treated more favorably. *Jones*, 488 F.3d at 407. Here, to show that she was denied access to the VTS floor solely by reason of her disability, instead of because of the safety and policy concerns raised by the presence of her dog, Plaintiff must show that other individuals were able to access the VTS floor with non-service animals. Plaintiff cannot make this showing. Plaintiff testified that she never saw another dog on the VTS unit (Plaintiff Dep. pp. 73), and Dr. Schuda testified that in 2018 all animals (including pets, therapy animals, comfort animals, Riverside's facility animals, and service animals) were excluded from areas where patients are in isolation. (Schuda Dep. pp. 137-140; Schuda Dep. Ex. C). According to Ms. Thompson, the VTS unit manager, as of 2018, animals of all kinds were prohibited from entering the VTS floor while patients were in isolation. (Thompson Dec. ¶ 19). Indeed, Ms. Thompson has never permitted any animal to be present on VTS while patients are in isolation. (Thompson Dec. ¶ 19). Plaintiff

therefore cannot establish that OhioHealth's proffered safety and policy reasons for denying her admission to the VTS floor on April 2 were insufficient to explain her exclusion.

Plaintiff's denial of access claim concerning April 2 must be dismissed. Plaintiff cannot establish a prima facie case of discrimination because she cannot show that she was excluded from the VTS floor "solely by reason of her disability." What is more, even if Plaintiff could establish a prima facie case, OhioHealth has proffered legitimate, non-discriminatory reasons for denying her access to the VTS unit, and Plaintiff cannot show them to be pre-textual. Plaintiff's claim must therefore be dismissed.

> 2. *Plaintiff cannot establish that she was denied access to the pre-operation area on October 8, 2018 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination.*
>
> a. <u>Plaintiff cannot establish a prima facie case of discrimination concerning her October 8 pre-operation area denial of access allegations.</u>

Plaintiff cannot establish a prima facie case of disability discrimination under Section 504 because she cannot show that OhioHealth denied her access to the pre-operation area on October 8 solely by reason of her disability as Section 504 requires. Initially, there is no evidence that the OhioHealth staff with whom Plaintiff interacted in the pre-operation waiting area knew she had a disability of any kind. Plaintiff testified that she did not tell OhioHealth staff in the pre-operation waiting area that her dog was a service dog or that she was disabled. (Plaintiff Dep. pp. 92-93). OhioHealth's decision to deny Plaintiff access to the pre-operation area with her dog could not have been made solely by reason of Plaintiff's disability if OhioHealth's staff in the pre-operation waiting area had no knowledge of her disability. *Landefeld v. Marion General Hosp., Inc.*, 994 F.2d 1178, 1181 (6th Cir. 1993) (holding that defendant could not have acted solely by reason of plaintiff's disability where defendant had no knowledge of plaintiff's disability).

Additionally, there is no dispute that Plaintiff visited with her father in the pre-operation area without her dog. (Plaintiff Dep. p. 93; Colon Dep. pp. 23-24). This fact persuasively shows that OhioHealth did not deny Plaintiff access to the pre-operation area in the company of her dog solely by reason of her disability as she was admitted to the area shortly thereafter without her dog but while still disabled. (Plaintiff Dep. pp. 29-42; Colon Dep. pp. 23-24). It was Plaintiff's *dog*, not Plaintiff's *disability*, that motivated OhioHealth to tell Plaintiff she could not take her dog into the pre-operation area. (Schuda Dep. p. 151).

Restricting Plaintiff's dog from the pre-operation area was consistent with OhioHealth's 2018 Infection Prevention Policy because of the significant procedures performed in the area such as the placing of IVs, full surgical skin preparation, and the administration of regional anesthesia. (Schuda Dep. p. 148-149; Schuda Dep. Ex. H, Sec. III, H). Indeed, OhioHealth's customer service office notified Plaintiff while her father was still waiting for his surgery that the kinds of procedures performed in the pre-operation area required the exclusion of her dog. (Plaintiff Dep. pp. 119-120). Consequently, because OhioHealth denied Plaintiff access to the pre-operation area on October 8 for a reason other than her disability, Plaintiff cannot show that she was denied access to the pre-operation area solely by reason of her disability and her prima facie case of discrimination fails for this reason too. *Burns*, 91 F.3d at 841-42 (no violation of the Rehabilitation Act where a challenged decision is made *because of* plaintiff's disability, but the disability is not the *sole reason* for the decision); *Moorman*, 47 F. App'x at 757 (affirming district court's grant of summary judgment in ADA Title II case were the evidence showed that "disability played no part in the decision to prohibit Smith's dog from staying with him during his hospitalization").

Additionally, Plaintiff again fails to identify any similarly situated comparators who received better treatment than her. That is, Plaintiff has identified no non-disabled individual who

was permitted to access the pre-operation area with an animal. *See Mitchell*, 964 F.2d at 583 ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority [individuals], the plaintiff must show that the 'comparables' are similarly situated *in all respects*."); *Carlson*, 2018 WL 2317820, at *3 (similarly situated comparators in case in which plaintiff was not permitted to have her dog in her apartment were those who had been permitted "to keep pets on the property while [plaintiff's] request for a service dog was denied"). In the absence of such comparator evidence, Plaintiff cannot establish a prima facie case of discrimination under Section 504. *Gohl*, 836 F.3d at 683. Plaintiff has no such evidence, and her prima facie case must fail as a result.

> b. <u>OhioHealth had a legitimate, non-discriminatory reason to deny Plaintiff access to the pre-operation area in the company of her dog on October 8, 2018.</u>

Even if Plaintiff could prove a prima facie case of disability discrimination with regard to the October 8 denial of access to the pre-operation area—which she cannot—OhioHealth denied Plaintiff access for a legitimate, non-discriminatory reason: OhioHealth's personnel were seeking to ensure the safety of the patients being prepared for surgery and to adhere to its 2018 Infection Prevention Policy. (Schuda Dep. pp. 148-149, 151). The Sixth Circuit has held that protecting patient safety and following internal policies are legitimate, non-discriminatory reasons for engaging in a challenged action. *See Wilson*, 579 F. App'x at 400 (6th Cir. 2014) (enforcement of policy concerning patient safety legitimate, non-discriminatory reason for employee's discharge); *Talwar*, 258 F. App'x at 806 (6th Cir. 2007) (patient safety legitimate, non-discriminatory reason for investigation of physician's practice); *Russell*, 549 F. App'x at 394 (6th Cir. 2013) (adherence to internal policy is a legitimate, non-discriminatory reason for discharge of employee).

> c. OhioHealth's reasons for denying Plaintiff access to the pre-operation area on April 2, 2018 were not pretext for discrimination.

Plaintiff cannot show OhioHealth's legitimate, non-discriminatory reasons for denying her access to the pre-operation area in the company of her dog on October 8 to be pretext for discrimination. Plaintiff cannot show that OhioHealth's proffered reasons for excluding her in the company of her dog from the pre-operation area on October 8 have no basis in fact—that they never happened or that they are factually false. *Jones*, 488 F.3d at 406. Plaintiff cannot dispute that OhioHealth's 2018 Infection Prevention Policy prohibits the presence of all animals in the pre-operation area as it is an area where significant procedures such as the placement of IVs and the administration of anesthesia are performed. (Plaintiff Dep. p. 121-122; Schuda Dep. pp. 148-149; Schuda Dep. Ex. H). Plaintiff also cannot dispute that her dog was not permitted into the pre-operation area for the safety of the patients who were about to undergo operations. (Schuda Dep. p. 149, 151).

Plaintiff also cannot show that OhioHealth's proffered reasons for excluding her from the pre-operation area while accompanied by her dog were not the actual reasons for her exclusion— that it is more likely a discriminatory reason motivated Plaintiff's exclusion from the pre-operation area than patient safety and the 2018 Infection Prevention Policy. *Manzer* 29 F.3d at 1084. There is simply no evidence that anything other than a desire to comply with the 2018 Infection Prevention Policy and to protect the safety of patients about to undergo surgery caused OhioHealth to exclude Plaintiff from the pre-operation area on October 8.

Finally, Plaintiff cannot show that OhioHealth's proffered reasons for excluding Plaintiff from the pre-operation area on October 8 while accompanied by her dog were insufficient to explain her exclusion, that is that similarly situated individuals seeking to access the VTS floor were treated more favorably. *Jones*, 488 F.3d at 407. All animals were prohibited from entering

the pre-operation area under the 2018 Infection Prevention Policy. (Schuda Dep. p. 149). Plaintiff has offered no evidence that any non-disabled individual was permitted access to the pre-operation area with a service animal or that OhioHealth has previously admitted any animal to the pre-operation area. Consequently, Plaintiff cannot show that OhioHealth's proffered reasons for denying Plaintiff access to the pre-operation area with her dog were pretext for discrimination and her claim must be dismissed.

3. *Plaintiff cannot establish that she was denied access to the VTS floor on October 8, 2018 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination.*

a. Plaintiff cannot establish a prima facie case of discrimination concerning her October 8 VTS unit denial of access allegations.

Plaintiff cannot establish a prima facie case of disability discrimination under Section 504 because she cannot show that OhioHealth denied her access to the VTS unit on October 8 solely by reason of her disability as Section 504 requires. When Plaintiff spoke to her father's nurse, Ms. Puchta, on October 8, she told Plaintiff that the VTS floor was a "special unit" and that no dogs were permitted. (Plaintiff Dep. p. 94). Ms. Puchta did not further explain why the VTS floor was a "special unit." (Plaintiff Dep. p. 96). Ms. Puchta called the VTS floor a "special unit" because, pursuant to OhioHealth policy, unlike the many general hospital units at Riverside, no animals of any kind were permitted on the VTS unit at that time because patients in isolation were receiving care on the unit. (Puchta Dec. ¶¶ 4, 5, 6; Schuda Dep. Ex. H). Indeed, on October 8, seven of the 32 patients receiving care on the floor were in isolation. (Schuda Dec. ¶ 9, Ex. B; *see also* Schuda Dep. p. 142). Consequently, Plaintiff was not permitted to bring her dog to the VTS floor on October 8 because of Ms. Puchta's desire to comply with OhioHealth policy—the 2018 Infection Prevention Policy—and for the safety of the patients being treated in isolation on that date. (Puchta Dec. ¶¶ 4, 5, 6, 7; Schuda Dep. pp. 140-143, 152). Denying a service dog access to an area of a

healthcare facility for reasons other than that the plaintiff had a disability does not violate Section 504. *See Moorman*, 47 F. App'x at 757 (affirming district court's grant of summary judgment in ADA Title II case were the evidence showed that "disability played no part in the decision to prohibit Smith's dog from staying with him during his hospitalization"); *see also Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011).

Once again, Plaintiff has not and cannot identify any similarly situated comparators who received better treatment than her. That is, Plaintiff has identified no non-disabled individual who was permitted to access the VTS floor with an animal. *See Mitchell*, 964 F.2d at 583 ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority [individuals], the plaintiff must show that the 'comparables' are similarly situated *in all respects*."); *Carlson*, 2018 WL 2317820, at *3 (similarly situated comparators in case in which plaintiff was not permitted to have her dog in her apartment were those who had been permitted "to keep pets on the property while [plaintiff's] request for a service dog was denied"). In the absence of such comparator evidence, Plaintiff cannot establish a prima facie case of discrimination under Section 504. *Gohl*, 836 F.3d at 683.

      b.  <u>OhioHealth had a legitimate, non-discriminatory reason to deny Plaintiff access to the VTS unit in the company of her dog on October 8.</u>

Even if Plaintiff could prove a prima facie case of disability discrimination with regard to the October 8 denial of access to the VTS floor—which she cannot—OhioHealth denied Plaintiff access for a legitimate, non-discriminatory reason: Ms. Puchta was seeking to ensure the safety of the patients receiving treatment on the VTS floor and to adhere to the 2018 Infection Prevention Policy. (Puchta Dec. ¶¶ 4, 5, 6, 7; Schuda Dep. pp. 140-143, 152). Both of these reasons are legitimate, non-discriminatory reasons for engaging in a challenged action. *See Wilson*, 579 F. App'x at 400 (enforcement of policy concerning patient safety legitimate, non-discriminatory

reason for employee's discharge); *Talwar*, 258 F. App'x at 806 (patient safety legitimate, non-discriminatory reason for investigation of physician's practice); *Russell*, 549 F. App'x at 394 (adherence to internal policy is a legitimate, non-discriminatory reason for discharge of employee).

      c.   <u>OhioHealth's reasons for denying Plaintiff access to the VTS floor on October 8 were not pretext for discrimination.</u>

Plaintiff cannot show OhioHealth's legitimate, non-discriminatory reasons for denying her access to the VTS floor in the company of her dog on October 8 to be pretext for discrimination. Plaintiff cannot show that OhioHealth's reasons have no basis in fact because she cannot show that Ms. Puchta was not attempting to comply with the 2018 Infection Prevention Policy or attempting to protect the eight patients in isolation when Plaintiff sought to bring her dog to the VTS floor. *Jones*, 488 F.3d at 406 (plaintiff must produce evidence that defendant's proffered reasons never happened, that they are factually false, to show they had no basis in fact). This Plaintiff cannot do. Plaintiff cannot dispute that there were seven patients in isolation on the VTS floor on October 8 or that Ms. Puchta told her she could not bring her dog to the "special unit" to protect those patients, consistent with the 2018 Infection Prevention Policy. Likewise, Plaintiff cannot dispute that OhioHealth excluded all animals, not just service animals, from the VTS unit while patients were in isolation for purposes of patient safety. (Schuda Dep. pp. 140-142; Schuda Dep. Ex. H; Thompson Dec. ¶ 19). Consequently, Plaintiff cannot show that OhioHealth's reasons for denying her admission to the VTS floor on October 8 had no basis in fact.

Similarly, Plaintiff cannot show that OhioHealth's reasons for denying her admittance to the VTS floor on October 8 were not the actual reasons for her exclusion. There is simply no evidence that Ms. Puchta denied Plaintiff access to the VTS floor on October 8 for any reason other than her concern for the safety of the eight isolation patients on the floor at the time and her

desire to comply with OhioHealth's 2018 Infection Prevention Policy. (Puchta Dec. ¶¶ 4, 5, 6, 7; Schuda Dep. pp. 140-143, 152).

Finally, Plaintiff cannot demonstrate that OhioHealth's proffered reasons for excluding her from the VTS floor on October 8 while accompanied by her dog were insufficient to explain her exclusion as she cannot show that any non-disabled individual seeking access to the VTS floor with a dog was permitted to enter. *Jones*, 488 F.3d at 407 (to show that a defendant's reason was not sufficient to motivate its action, a plaintiff must show that similarly situated individuals seeking to access the VTS floor were treated more favorably). Additionally, Plaintiff testified that she never saw another dog on the VTS unit (Plaintiff Dep. pp. 73), and Dr. Schuda testified that in 2018 all animals (including pets, therapy animals, comfort animals, Riverside's facility animals, and service animals) were excluded from the VTS unit while patients were in isolation. (Schuda Dep. pp. 141-143; Schuda Dep. Ex. H). According to Ms. Thompson, the VTS unit manager, she never permitted an animal access to VTS while patients have been in isolation under the 2017 or 2018 Infection Prevention Policies. (Thompson Dec. ¶ 19). Plaintiff therefore cannot establish that OhioHealth's proffered safety and policy reasons for denying her admission to the VTS floor on October 8 were insufficient to explain her exclusion.

Plaintiff's denial of access claim concerning October 8 must be dismissed. Plaintiff cannot establish a prima facie case of discrimination because she cannot show that she was excluded from the VTS floor "solely by reason of her disability." What is more, even if Plaintiff could establish a prima facie case, OhioHealth has proffered legitimate, non-discriminatory reasons for denying her access to the VTS unit, and Plaintiff cannot show them to be pre-textual. Plaintiff's claim must therefore be dismissed.

40

    4. *Plaintiff cannot establish that she was denied access to the VTS floor on April 3-9 or October 9-12, 2018 solely by reason of her disability or show that OhioHealth's legitimate, non-discriminatory reason for denying her access was pretext for discrimination.*

Plaintiff claims that OhioHealth unlawfully denied her access to the VTS floor from April 3 until April 9 when her father was discharged and again from October 9 through October 12. (SAC ¶105; Plaintiff Dep. p. 229). Initially, Plaintiff was not denied access to the VTS unit on April 3. She testified that she visited her father on VTS that day without her dog and had a normal visit. (Plaintiff Dep. p. 78, 195-196). Thus, Plaintiff's claim with respect to April 3 is without merit.

Additionally, OhioHealth did not unlawfully deny Plaintiff access to the VTS floor on April 4-9 or October 9-12. Plaintiff did not attempt to visit her father on the VTS unit with or without her dog on any of those dates. (Plaintiff Dep. pp. 79, 98). Plaintiff testified that she made the decision not to visit her father on April 4-9 and October 9-12. (Id.). Consequently, it was Plaintiff who decided not to seek access to the VTS floor on April 4-9 and October 9-12. OhioHealth should not be held responsible for denying Plaintiff access to the VTS floor on these dates when Plaintiff never sought it.

Even if Plaintiff can assert a claim of intentional discrimination with respect to these dates, the claim like all of Plaintiff's other intentional discrimination claims, fails. This is because if Plaintiff had been denied access to the VTS floor on April 4-9 and October 9-12, her disability would not have been the sole basis for her exclusion. *Lee*, 636 F.3d at 250. Plaintiff's disability was *never* a basis, let alone the sole basis, for her exclusion from the VTS floor; Plaintiff was only denied access to the VTS floor because she was with her dog and the presence of her dog would have violated OhioHealth policy and jeopardized the safety of the VTS patients in isolation. (Schuda Dep. pp. 121, 137-143). Denying a service dog access to an area of a healthcare facility

41

for non-disability reasons does not violate Section 504. *See Moorman*, 47 F. App'x at 757 (affirming district court's grant of summary judgment in ADA Title II case were the evidence showed that "disability played no part in the decision to prohibit Smith's dog from staying with him during his hospitalization"). Plaintiff cannot dispute that the 2017 Infection Prevention Policy prohibited animals in areas where any patient was in isolation was in effect on April 4-9. (Schuda Dep. Ex. C). Nor can Plaintiff dispute that, on average, eight patients were receiving care on VTS while in isolation each day from April 4-9. (Schuda Dec. ¶ 8, Ex. A).

Likewise, Plaintiff cannot dispute that the 2018 Infection Prevention Policy prohibits animals in all areas where any patient is in isolation. (Schuda Dep. Ex. H). Plaintiff cannot dispute that OhioHealth understood this restriction to mean that if any patient was in isolation on a unit, no animals were permitted on the unit. (Schuda Dep. p. 141; Thompson Dec. ¶ 9). And Plaintiff cannot dispute that, on average, eight patients were receiving care on VTS while in isolation each day from October 9-12. (Schuda Dec. ¶ 9, Ex. B). As a result, Plaintiff cannot show that if OhioHealth had excluded her from the VTS floor on April 4-9 and October 9-12, her disability would have been the sole reason for that exclusion. Further, Plaintiff has no evidence that any non-disabled person was able to access the VTS floor with an animal. The absence of this required comparator evidence dooms Plaintiff's prima facie case. *Gohl*, 836 F.3d at 683. Plaintiff's claims with regard to these dates must, therefore, be dismissed. Complying with its relevant policies and seeking to ensure patient safety are, of course, legitimate, non-discriminatory reasons for denying Plaintiff access to the VTS floor and Plaintiff cannot show that those reasons would have been pretext for disability discrimination.

**E.  Plaintiff's Claim That OhioHealth Discriminated Against Her In Violation of Section 504 of the Rehabilitation Act of 1973 By Delaying Her Access To Her Father In the Emergency Room On October 3, 2018 Fails As A Matter of Law.**

In addition to her intentional discrimination claims alleging denial of access to the VTS unit and the pre-operation area, Plaintiff attempts to claim that OhioHealth intentionally discriminated against her by delaying her access to her father in the Riverside Emergency Department on October 3. (Plaintiff Dep. p. 237). Plaintiff's claim fails for two reasons.

Initially, Plaintiff did not plead this claim. The SAC alleges only that OhioHealth violated Section 504 on April 2-9 and October 8-12. (SAC ¶¶ 83, 105). Plaintiff also testified that other than the dates set forth in the SAC, she was not claiming that OhioHealth violated Section 504 on any other date.

Q:    [Y]ou allege that you were discriminated against on April 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, and 9th in 2018?

A:    Yes.

Q:    And on October 8th, 9th, 10th, 11th, and 12th in 2018, correct?

A:    Yes.

Q:    You don't allege that you were discriminated against by OhioHealth because of your disability on any other date, correct?

A:    Correct.

(Plaintiff Dep. pp. 122-123).  Plaintiff only claimed she was alleging that her interactions with OhioHealth on October 3 were discriminatory when prodded by her attorney. (Plaintiff Dep. pp. 235-237). Consequently, Plaintiff should not be permitted to assert this unpled allegation that she expressly waived during her deposition. *Tinch v. City of Dayton*, 77 F.3d 483 (6th Cir. 1996) (holding that plaintiff's failure to plead Section 1983 constituted waiver of the claims).

Even if Plaintiff is permitted to assert her claim with regard to October 3, it fails. Initially, any delay Plaintiff experienced in accessing her father on October 3 was her own fault, not

OhioHealth's. Plaintiff does not dispute that when she entered the Emergency Department a nurse—Ms. Detwiler—asked her about her dog and then went to ensure the dog could be in the department and to ensure her father was settled and able to receive visitors. (Plaintiff Dep. p. 83; Bullock Dec. ¶ 3, 4). Plaintiff also does not dispute that she quickly became impatient and left the Emergency Department. (Plaintiff Dep. p. 83). Though Ms. Detwiler returned to inform Plaintiff that she and her dog could see her father within 10 minutes, Plaintiff was nowhere to be found. (Plaintiff Dep. pp. 83-85; Schuda Dep. Ex. F; Bullock Dec. ¶ 6). Ms. Detwiler had to search for her and located her in the Service Excellence Office. (Plaintiff Dep. pp. 83-85; Schuda Dep. Ex. F; Bullock Dec. ¶¶ 6, 7). Upon locating Plaintiff, Ms. Detwiler told her that she (and her dog) could see her father. (Plaintiff Dep. pp. 83-85; Schuda Dep. Ex. F; Bullock Dec. ¶ 7). If Plaintiff had remained in the Emergency Department, she would have been permitted to access her father's room within 10 minutes. (Schuda Dep. Ex. F; Bullock Dec. ¶ 6). Plaintiff cannot dispute that it is common for visitors to wait 10 to 20 minutes when arriving in the Emergency Department before being permitted to see a patient. (Bullock Dec. ¶ 8). Thus, the allegedly unlawful delay of which Plaintiff complains was of her own causing and, in any event, Plaintiff was treated no worse than non-disabled visitors to the Emergency Department.

Any claim by Plaintiff that she would have been unlawfully delayed even if she had remained in the Emergency Department is unfounded. After initially speaking to Plaintiff about her dog, Ms. Detwiler called Riverside Risk Management to ensure the dog could be in the department and checked to ensure Plaintiff's father was able to receive visitors. (Schuda Dep. Ex. F; Bullock Dec. ¶ 4). It is normal emergency department procedure to ensure emergency patients are stable and able to receive visitors prior to permitting visitors access. (Bullock Dec. ¶ 8). It is normal Riverside procedure for an employee to call Risk Management if they are unsure if an

animal—whether a service animal, comfort animal, therapy animal, pet, or any other animal—can access an area of the hospital. (Bullock Dec. ¶ 5). Consequently, any delayed access Plaintiff experienced on October 3 was caused by considerations other than her disability. Because the alleged October 3 delay was not caused solely by reason of her disability, Plaintiff's intentional discrimination claim must fail. *Lee*, 636 F.3d at 250.

### F. Plaintiff's Claim That OhioHealth Failed to Accommodate Her Disability In Violation of Section 504 of the Rehabilitation Act of 1973 Fails As A Matter of Law.

Plaintiff did not plead a failure to accommodate claim under Section 504 but appears to argue that she has nonetheless asserted such a claim. (*See* SAC ¶¶86-106; Plaintiff Dep. pp. 128-129). To the extent Plaintiff argues that OhioHealth failed to accommodate her disability by not granting her dog access to certain areas of Riverside so she could participate in OhioHealth's patient visitation program, her claim fails as a matter of law for several reasons.

While Section 504 does not contain an express accommodation requirement, the Supreme Court has implied such a duty. *Alexander v. Choate,* 469 U.S. 287, 301 (1985). Section 504 "requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the [federal] grantee offers." *Alexander*, 469 U.S. at 301. "[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Id.*

Courts analyze the Rehabilitation Act's duty to accommodate as part of Section 504's "otherwise qualified" requirement. *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 575 (6th Cir. 1988). To prove discrimination based on a failure to make a reasonable accommodation, a plaintiff must show that the defendant could have reasonably accommodated her but refused to do so. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 461 (6th Cir. 1997). The burden is on the plaintiff to show that she made a request for an accommodation. *Gantt v. Wilson Sporting*

*Goods Co.*, 143 F.3d 1042, 1046 n.4 (6th Cir. 1998). The plaintiff must also show that she is qualified and can meet the requirements of the defendant's program with a reasonable accommodation. *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015). "A plaintiff thus bears the burden of proposing an accommodation and proving that it is reasonable, including establishing that [s]he can meet [the] necessary requirements with that accommodation." *Id.* (internal citations and quotations omitted). An accommodation, however, is not reasonable or required if it is not necessary, poses an undue financial and administrative burdens on a grantee, requires a fundamental alteration, or poses a direct threat to others. *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1035 (6th Cir. 1995).

Plaintiff cannot maintain a claim under Section 504 that OhioHealth failed to accommodate her. As fully explained below, Plaintiff failed to plead an accommodation claim and no such claim is properly before this Court. Even if Plaintiff did plead a failure to accommodate claim, she failed to request an accommodation from OhioHealth; no accommodation was necessary for her to meaningfully participate in the visitor access program; and the accommodation Plaintiff claims to have requested would have fundamentally altered OhioHealth's services and/or posed a direct threat to the health or safety of others. Accordingly, any failure to accommodate claim Plaintiff asserts must be dismissed.

> 1. *Plaintiff did not plead that OhioHealth failed to accommodate her alleged disability and she is precluded from pursuing this theory of liability.*

Disability discrimination claims under Section 504 come in two varieties: intentional discrimination (also called disparate treatment) and failure to accommodate. *See, e.g., Gohl*, 836 F.3d at 682 (intentional discrimination claim); *Doherty*, 862 F.2d. at 574-75 (failure to

accommodate claim).[16] It is clear that the two potential disability discrimination claims are separate and distinct from one another. *See Jones v. Sumser Retirement Village*, 209 F.3d 851, 854 (6th Cir. 2000) (recognizing that "a [disability discrimination] termination claim differs in kind . . . from an accommodation claim" and the facts relevant to each claim are different); *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 n.4 (6th Cir. 2004) (noting that intentional discrimination claims are independent from failure to accommodate claims); *Wisconsin Cmty. Svcs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (en banc) (recognizing that failure to accommodate is an independent claim under the ADA); *Muhammad v. Court of Common Pleas of Allegheny County, Pa.*, 483 F. App'x 759, 763 (3d Cir. 2012) ("[A] plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA."). As a result, the assertion of one of these claims does not automatically include the assertion of the other. *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 897-98 (7th Cir. 1999). Consequently, where only either failure to accommodate or intentional discrimination is complained of, a plaintiff is barred from later raising the other theory of disability discrimination. *Id.* (precluding plaintiff from raising intentional discrimination claim where EEOC charge only alleged failure to accommodate because the claims are not reasonably related).

Here, Plaintiff pled only a single cause of action under Section 504. (SAC ¶¶86-106). The SAC does not identify the kind of Section 504 claim Plaintiff asserts, but the allegations indicate Plaintiff's cause of action is for intentional discrimination. (SAC ¶¶86-106). The SAC specifically alleges that OhioHealth discriminated against Plaintiff because of her alleged disability by denying Plaintiff access to certain areas of Riverside with her alleged service animal. (SAC ¶¶94, 95, 96, 98, 101). For example, in Paragraph 94 of the SAC, Plaintiff alleged that OhioHealth

---

[16] The Sixth Circuit has not recognized a disparate impact claim under Section 504. *See Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 242 (6th Cir. 2019).

"discriminated . . . against Ms. Hedrick solely on the basis of her disability by denying her permission to be accompanied by her service animal in all areas of OHC's facilities . . . ." (SAC ¶94) (emphasis added). In Paragraph 101 of the SAC, Plaintiff alleged that "[e]ach incident in which OHC delayed and/or denied Ms. Hedrick access because of her service animal" caused her emotional distress. (SAC ¶101) (emphasis added).

Indeed, the overriding theory of Plaintiff's substantive cause of action is that she was denied access to the VTS floor and the pre-operation area because she had a service dog when non-disabled visitors were not. (SAC ¶95) (alleging that Ms. Hedrick or others informed OhioHealth that "denying Ms. Hedrick permission to enter areas of its facilities where the public was allowed to enter without restriction because of her service animal constituted disability discrimination.").[17] In contrast, nowhere in Plaintiff's substantive cause of action does she claim that she requested a reasonable and necessary accommodation or that OhioHealth failed to provide her with her reasonable and necessary accommodation. (SAC ¶¶86-106). Plaintiff has simply never pled a failure to accommodate claim.

Importantly, once a case proceeds to the summary judgement state, the liberal pleading standards are not strictly applicable. *Tucker v. U.N.I.T.E.*, 407 F.3d 784 (6th Cir. 2005). Indeed, the "notice pleading requirement 'is more demanding at the summary judgment stage than at earlier stages of the litigation, because by this point a plaintiff has had the opportunity to conduct discovery and to amend the complaint to reflect new theories.'" *Hoff-Pierre v. University Hosp., Inc.*, 523 F. App'x 313 (6th Cir. 2013) (affirming district court's refusal to permit plaintiff to assert FMLA interference claim where only FMLA retaliation claim was pled and FMLA interference

---

[17] Indeed, Plaintiff's own description of her claim in the Parties' Rule 26 Report shows that Plaintiff pled only an intentional discrimination claim. Plaintiff stated: "Plaintiffs allege defendant denied Sara Hedrick access to visit with Thomas Hedrick specifically *because of* her service animal and violated . . . Section 504 of the Rehabilitation Act." (Doc. 6, p. 2).

and retaliation claims are "discrete theories of recovery"). Plaintiff has amended her complaint *twice* in this case and has nevertheless failed to place a failure to accommodate claim before this Court. (*See* Docs. 1, 22, 73). Having failed to plead a failure to accommodate claim, Plaintiff's failure to accommodate allegations must be dismissed. *Tinch v. City of Dayton*, 77 F.3d 483 (6th Cir. 1996) (table) (holding that plaintiff's failure to plead Section 1983 constituted waiver of the claims).

### 2. *Plaintiff never requested an accommodation.*

Even if Plaintiff has pled a failure to accommodate claim, OhioHealth is entitled to summary judgement because Plaintiff never requested an accommodation. To sustain a claim that OhioHealth failed to grant her a reasonable accommodation, Plaintiff must first show that she requested an accommodation. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 n.4 (6th Cir. 1998). "The burden is on the plaintiff to make a direct and specific request for special accommodations before any duty is triggered." *Jones v. Univ. of Memphis*, 2016 WL 11496100, at *6 (W.D. Tenn. Sept. 9, 2016) (internal quotations omitted); *see also Gati v. W. Kentucky Univ.*, 762 F. App'x 246, 251 (6th Cir. 2019) (the initial burden is on the plaintiff to propose an accommodation and prove it is reasonable). When requesting an accommodation, a disabled individual must "make it clear both that he is making a request and that he is doing so because of his disability." *Waggoner v. Carlex Glass Am. LLC*, 682 F. App'x 412, 416 (6th Cir. 2017). Since Plaintiff never requested an accommodation, her claims must fail.

  a. <u>Plaintiff never requested an accommodation on April 2 and OhioHealth did not unlawfully deny Ms. Burkholder's April 6 request.</u> [18]

Any claim by Plaintiff that OhioHealth failed to accommodate her disability in April 2018 must fail because Plaintiff never made a "direct and specific request" for an accommodation. *Jones*, 2016 WL 11496100, at *6. When Plaintiff arrived in her father's VTS room on April 2, Ms. Larry told her: "I'm sorry you can't have your dog here." (SAC ¶ 29; Plaintiff Dep. p. 69). In response, Plaintiff claimed that her dog was a service dog and he was allowed to be on VTS. (Plaintiff Dep. pp. 69-70). After Ms. Larry confirmed with her manager that Plaintiff's dog was not permitted on VTS, Plaintiff left. (Plaintiff Dep. pp. 67-68).

At no time during Plaintiff's conversation with Ms. Larry did she ever directly make any request, including a request for an accommodation. The best Plaintiff did was communicate her belief that her dog was permitted on the unit. Plaintiff testified about her interchange with Ms. Larry as follows:

Q: Okay. And I want to make sure that I understand. So you're saying that she [Ms. Larry] came into the room and she said I'm sorry you can't have your dog here?

A: Correct.

Q: Okay. And then how did you respond to that?

A: I responded respectfully and I told her that he is my service dog, that he's permitted here, he's for me, and I –

Q: Did you say anything else to her?

A: This—I asked why he wasn't—why he wasn't allowed on the floor, and she said it was a special unit.

Q: Okay. Anything else at that time?

A: No. I didn't say anything else.

---

[18] Plaintiff admitted that OhioHealth permitted her to take her dog with her during all other visits except April 2 and October 8. (*See* SAC ¶¶ 19-21, 53, 58, 66, and 82). As such, no failure to accommodate claim exits.

(Plaintiff Dep. pp. 69-70). There was no "request" of any kind in Plaintiff's discussion with Ms. Larry.

It was Plaintiff's burden to ask for an accommodation if she needed one. *Shaikh*, 608 F. App'x at 353. OhioHealth was not required to speculate as to whether Plaintiff was asking for an accommodation or simply asserting her belief that her dog could be on VTS. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998) (recognizing with regard to failure to accommodate claims in the employment context that "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."). *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155 (5th Cir. 1996) is illustrative. In *Taylor*, an employee informed his employer that he had been diagnosed with bipolar disorder and asked the employer to research the disorder so that they could discuss his condition. *Id.* at 159. But the employee never specifically asked for an accommodation and the Fifth Circuit held that the employer did not unlawfully fail to accommodate a request that had never been made. *Id.* at 165. Here, as Plaintiff's deposition testimony makes clear, she never asked Ms. Larry for an accommodation, and Ms. Larry was not required to speculate in that regard. Thus, any failure to accommodate claim asserted by Plaintiff concerning the events of April 2 must fail.

Plaintiff will likely point to Ms. Burkholder's April 6 email to Dr. Schuda as Plaintiff's request for an accommodation in April 2018. Ms. Burkholder's April 6 email did "formally ask for an accommodation" for Plaintiff.[19] (Schuda Dep. Ex. N). Nevertheless, OhioHealth did not unlawfully fail to accommodate Plaintiff. As Ms. Burkholder's April 6 email reveals, prior to that date she had been in discussion with Dr. Schuda about ways OhioHealth could facilitate Plaintiff's

---

[19] For the reasons set forth below, any accommodation request made in April 2018 was also unnecessary and would have required a fundamental alteration in OhioHealth's program and/or constituted a direct threat to the health and safety of isolated patients on VTS.

visits to VTS without her dog by, for example, using OhioHealth staff to assist Plaintiff to the extent possible or by exploring the medical possibility of transferring Mr. Hedrick to a unit Plaintiff's dog could access. (Id.). Ms. Burkholder's April 6 email was sent on a Friday afternoon and, by its own terms, Ms. Burkholder's request was limited to "the duration" of Mr. Hedrick's April 2018 hospitalization. (Id.). The very next business day, Mr. Hedrick was discharged from Riverside. (SAC ¶46). Thus, Ms. Burkholder's request for an accommodation for "the duration of [Mr. Hedrick's] stay at Riverside Methodist Hospital's Vascular and Thoracic Surgery unit" expired by its terms and became moot on April 9. Even so, Dr. Schuda responded to Ms. Burkholder's email approximately one business week later, on April 16, after obtaining advice from OhioHealth's attorneys. (Schuda Dep. p. 91; Schuda Dep. Ex. N).

OhioHealth was not required to grant a request for an accommodation that was no longer needed or necessary. *See Chalmers v. Intel Corp*, 2014 WL 358989, at *4 (D. Ariz. Feb. 3, 2014) (need for requested accommodation—less travel from Arizona to Oregon—became moot when plaintiff obtained a job in Arizona). And while an unreasonable delay in providing an accommodation may constitute a constructive failure to accommodate, failing to provide a requested accommodation on the next business day is not an unreasonable delay. *Hurston v. Butler Cty. Dep't of Jobs & Family Servs.*, 2005 WL 2416566, at *8 (S.D. Ohio Sept. 30, 2005) (holding that a one-and-a-half-month delay in providing a requested accommodation was not unreasonable); *Edmunds v. Bd. of Control of E. Michigan Univ.*, No. 09-11648, 2009 WL 5171794, at *5 (E.D. Mich. Dec. 23, 2009) (holding that a three month delay in providing an accommodation was not disability discrimination). Thus, even if Ms. Burkholder made an effective request for an accommodation on April 6, OhioHealth's response was not inappropriate or unlawful as Ms.

Burkholder's request expired on April 9 with Mr. Hedrick's discharge. Consequently, any failure to accommodate claim Plaintiff may have with respect to April 2018 must fail as a matter of law.

> b. <u>Plaintiff never requested an accommodation on October 8, 2020.</u>

Like the April 2 visit to VTS, Plaintiff never requested an accommodation for her dog on October 8. When OhioHealth staff informed Plaintiff that she could not take her dog to the pre-operating area, Plaintiff's only response was "okay." (Plaintiff Dep. pp. 92-93). Plaintiff's sister stayed with the dog while Plaintiff visited with her father without her dog. (Plaintiff Dep. p. 93; Colon Dep. pp. 23-24). There is no evidence that Plaintiff ever requested an accommodation in the pre-operation area. In the absence of a request, OhioHealth cannot have failed to accommodate Plaintiff in the pre-operation area on October 8. *Shaikh*, 608 F. App'x at 353; *Gantt*, 143 F.3d at 1046-47.

There is similarly no evidence that Plaintiff ever requested an accommodation on October 8 when her father was transferred to VTS. It was Plaintiff's father who initially told her that she could not bring her dog to the floor. (Plaintiff Dep. pp. 93-94). When her father's nurse, Ms. Puchta, subsequently explained to Plaintiff that her dog could not come to the floor, Plaintiff told Ms. Puchta that her dog was her service dog and that she had "stuff" for her father, including his glasses, cell phone, and a clock. (Plaintiff Dep. pp. 95-96; SAC ¶73). Plaintiff testified as follows concerning her interaction with Ms. Puchta:

> Q:      Did you hear what [your father] said to Jessica [Puchta]?
>
> A:      Not—not on the phone. Before I called him I knew the answer. I knew that I couldn't bring my dog—service dog upstairs with him.
>
> Q:      Okay. So he says you can't come because of Rufus?
>
> A:      Yes.
>
> Q:      And then you asked to talk to the nurse?

A:    Yes, Jessica.

Q:    And what exactly did Jessica say to you?

A:    I told her I have stuff for my dad, and she said I couldn't bring my dog upstairs with me. And I asked why, and she said it was a special unit.

Q:    Did you tell Jessica that Rufus was a service dog?

A:    Yes, that he was for me.

Q:    So did you say he is for me or did you say he was a service dog?

A:    He is my service dog.

Q:    That's what you said to her?

A:    Yes.

Q:    And her response was that this is a special unit—

A:    Correct.

Q:    —and so you can't bring your dog on the special unit?

A:    Correct.

Q:    And did she say what she meant by special unit?

A:    No, she—I asked and she did not clarify what special unit it was, why it was a special unit.

Q:    Did she say you couldn't come without Rufus?

A:    No.

Q:    Did you say anything else to your father's nurse on April—strike that—October 8th?

A:    No, that I would wait for her downstairs to retrieve my dad's items.

(Plaintiff Dep. pp. 95-97).  Plaintiff did not request an accommodation at any time during her interaction with Ms. Puchta. At best, by identifying that her dog was a service dog, Plaintiff identified that she was disabled. However, mere disclosure of a disability, without more, is not a request for an accommodation. *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir.

54

2016); *Waggoner*, 682 F. App'x at 416 (finding that plaintiff did not request an accommodation by telling his employer about his disability and complaining about other employees). As a result, any failure to accommodate claim Plaintiff may assert with respect to her ability to access VTS on October 8 must fail as a matter of law.

3. *Even if Plaintiff requested that OhioHealth permit her to access VTS or the pre-operation area floor with her dog, the requested accommodation was not necessary for Plaintiff to participate in OhioHealth's patient visitation program.*

If Plaintiff did request that OhioHealth accommodate her by altering its 2017 or 2018 Infection Prevention Policies so that she could access VTS or the pre-operation area with her dog, OhioHealth is still entitled to summary judgment on her failure to accommodate claims. This is because the accommodation Plaintiff allegedly sought was not necessary.

Section 504 requires reasonable accommodations to ensure disabled individuals have meaningful access to the programs of federal grantees. *Alexander*, 469 U.S. at 301. It, however, does not require accommodations "beyond those necessary to eliminate discrimination against otherwise qualified individuals." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979). The statute promises equal opportunity, not equal results. *Alexander*, 469 U.S. at 304. Thus, Section 504 requires only those accommodations that are necessary to ameliorate a disability's effect of preventing meaningful access to the benefits of, or participation in, the program at issue. *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 678 F. Supp. 2d 576, 582-83 (E.D. Mich. 2009). An accommodation is "necessary only 'when it allows the disabled person to obtain benefits they ordinarily could not have by reason of their disabilities, and not because of some quality they share with the public generally.'" *C.S. v. Ohio High Sch. Athletic Ass'n*, 2015 WL 4575217, at *7 (S.D. Ohio July 29, 2015). Indeed, the accommodation must be necessary to allow the person to overcome the disability so that the disability no longer prevents a barrier to the individual's participation in the program. *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026,

1035 (6th Cir. 1995). "Stated differently, there must be a 'direct nexus' or 'direct correlation' between the plaintiff's handicap and the barrier to his or her equal access to the program or benefit at issue." *Fialka-Feldman*, 678 F.S upp. 2d at 583. The Supreme Court has explained that a requested accommodation is not necessary where a disability makes accessing a program or benefit "uncomfortable" or "difficult," but not beyond the disabled person's capacity. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001). "In such cases, an accommodation might be reasonable, but not necessary." *Id.* "Plaintiffs bear the burden of demonstrating that the desired accommodation is necessary to afford equal opportunity." *Smith & Lee Assoc., Inc. v. City of Taylor*, 102 F.3d 781, 795-96 (6th Cir. 1996).

Plaintiff's requested accommodation was not necessary to give her meaningful access to the benefits of OhioHealth's visitation program. Indeed, Plaintiff does not dispute that she meaningfully visited her father without her requested accommodation—the presence of her dog. There is no dispute that on April 3, Plaintiff visited her father on VTS without her dog. (Plaintiff Dep. pp. 78, 195-196). During her April 3 visit, Plaintiff suffered from all the same psychological conditions that form her disability. (Plaintiff Dep. p. 78). During that visit, Plaintiff conversed with her father, was able to ascertain his condition and plan of treatment, and told her father that she loved him. (Plaintiff Dep. p. 196). Plaintiff agreed that her April 3 visit was a "normal" hospital visit. (Plaintiff Dep. p. 196). Likewise, there is no dispute that Plaintiff visited her father in the pre-operation area on October 8 without her dog. (Plaintiff Dep. p. 93; Colon Dep. pp. 23-24). Again, Plaintiff agreed that the visit was normal. (Plaintiff Dep. pp. 196-197). Plaintiff wished her father a good surgery, told him she hoped to see him after the surgery was over, told him that she loved him, and jokingly warned him to "behave." (Plaintiff Dep. pp. 196-197).

Plaintiff had meaningful access to and, in fact, received the same benefit all other OhioHealth visitors receive: access to visit patients who would receive them. And Plaintiff had this access *without* her requested accommodation—the presence of her dog. Plaintiff attempts to argue that the absence of her dog deprived her of meaningful access to her father. She testified that during her April 3 visit she was "very anxious, scattered" and that she was concerned that her dog was not there if she had a meltdown or her blood sugar bottomed out. (Plaintiff Dep. pp. 229-231).

But Plaintiff's argument has three problems. First, according to Plaintiff, visiting her father without her dog on April 3 impacted the *results* of her visit—that is, how *she felt* during her visit—not her *opportunity* to visit. (Plaintiff Dep. pp. 229-231). Plaintiff does not dispute that she was able to access her father, effectively communicate with him, and even demonstrate appropriate emotion during both her April 3 and October 8 visits without her dog. (Plaintiff Dep. p. 78, 93, 195-197). Section 504 promises equal opportunity, not equal results. *Alexander*, 469 U.S. at 304. Plaintiff recognizes this reality. She testified as follows:

> Q: And just to be clear, your claim is not that Riverside had an obligation to make sure you had a good visit with your father, but that you were entitled to visit with you father; is that right?
>
> A: Yes.

(Plaintiff Dep. p. 201-202). Plaintiff's ability to visit her father without her dog on April 3 and October 8 powerfully demonstrate that her alleged requested accommodation—the presence of her dog—was not necessary to ensure she had an opportunity to visit her father equal to that of non-disabled persons.

Second, Plaintiff does not dispute that the feelings she experienced during her April 3 visit with her father are common to all hospital visitors. Plaintiff testified that OhioHealth cannot ensure that visits between visitors and patients are happy, stress-free, or that they do not produce anxiety. (Plaintiff Dep. p. 201). Common sense teaches that hospital visits are, by their very nature, often

stressful and anxiety producing. Accordingly, the feelings experienced by Plaintiff while visiting her father without her dog are no different than those often experienced by non-disabled individuals while visiting hospitalized friends or family.

Third, at best, Plaintiff's testimony concerning the impact of visiting her father without her dog shows that such visits are uncomfortable or difficult for her, not that she cannot meaningfully visit without her dog. But a requested accommodation is not necessary under Section 504 to alleviate discomfort or difficulty, only to provide meaningful access to the benefit or program of the federal grantee. *Martin*, 532 U.S. at 682; *Sandison*, 64 F.3d at 1035; *Fialka-Feldman*, 678 F. Supp. 2d at 583. Here, Plaintiff's requested accommodation was not necessary for her to meaningfully visit with her father—she proved that on April 3 and October 8 when she visited without her dog. As a result, OhioHealth is entitled to summary judgment on any failure to accommodate claims Plaintiff purports to bring and those claims must be dismissed.

> 4. *Even if Plaintiff requested that OhioHealth permit her to be on the VTS floor or in the pre-operation area with her dog, her requested accommodation would fundamentally alter the nature of the services OhioHealth provides in those areas.*

OhioHealth is entitled to summary judgment on any failure to accommodate claims Plaintiff asserts because granting Plaintiff's allegedly requested accommodation would have fundamentally altered the care provided by OhioHealth on VTS and in the pre-operation area. A proposed accommodation is not reasonable under Section 504 if it "imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of the program." *Sandison v. Michigan High Sch. Athletic Ass'n, Inc*., 64 F.3d 1026, 1034 (6th Cir. 1995) (internal quotations omitted); *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. 2015). Permitting Plaintiff to bring her dog onto VTS or into the pre-operating area would have required a fundamental alteration of the services OhioHealth provides in those areas and jeopardized the welfare of the patients receiving treatment in those areas. Thus, OhioHealth was

not required to permit Plaintiff to access VTS or the pre-operation area in the presence of her dog and summary judgement is appropriate.

The Sixth Circuit has recently clarified the distinction between requested accommodations that are reasonable and those that cause fundamental alterations. *See Davis v. Echo Valley Condominium Assoc.*, 945 F.3d 483 (6th Cir. 2019). In *Davis*, the Sixth Circuit explained that a requested accommodation seeks a change that is fundamental, not reasonable, if it: 1) "turns the challenged policy into something else entirely;" or 2) "interfere[s] with the rights of third parties." *Id.* at 491-92. Concerning the latter variety of fundamental alteration, the Sixth Circuit stated that "a third party's rights [do] not have to be sacrificed on the altar of reasonable accommodation." *Id.* at 492 (quoting *Groner v. Golden Gate Apartments*, 250 F.3d 1039, 1046-47 (6th Cir. 2001)). Thus, in the housing context, a tenant need not be forced to move in order to accommodate the disability of a neighbor. *See Groner*, 250 F.3d at 1046; *see also Temple v. Gunsalus*, 1996 WL 536710, at *2 (6th Cir. Sept. 20, 1996) (per curiam). In the employment context, an employer is not required to "bump another employee from a position in order to accommodate a disabled employee." *Davis*, 945 F.3d at 492 (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001)). Thus, if a requested accommodation compromises the rights of a third party, the sought-after accommodation would require a fundamental alteration and is not reasonable.

The accommodation Plaintiff allegedly requested—to be accompanied by her dog on VTS and in the pre-operation area—would have required a fundamental alteration because of its impact on the rights of third parties. Plaintiff cannot dispute that every patient treated on VTS had the right to "competent . . . care and treatment . . . ." (Hendricks Dep. Ex. J, p. 5, Right No. 3). Plaintiff is also unable to dispute that if a patient is placed on VTS for treatment, it is because his or her physician had determined such a placement to be medically necessary. (Thompson Dec. ¶ 3).

Plaintiff cannot dispute that VTS was caring for, on average, eight isolation patients each day Mr. Hedrick was hospitalized in April and October 2018. (Schuda Dec. ¶¶ 8, 9, Exs. A, B). Plaintiff does not and cannot dispute that OhioHealth's 2017 and 2018 Infection Prevention Policies prohibit the presence of any animals in areas where any patient is in isolation. (Schuda Dep. Ex. C, Sections I.D.1 and III.L.1; Ex. H, Sections I.D.1 and III.H.1). Plaintiff cannot dispute that Ms. Thompson, Ms. Larry, and Ms. Puchta lacked authority to deviate from the applicable Infection Prevention Policy and permit Plaintiff on VTS with her dog. (Schuda Dep. pp. 14, 61, 123; Thompson Dec. ¶ 11; Larry Dec. ¶ 7; Puchta Dec. ¶ 7). As a result, the only way Plaintiff could have been permitted to visit her father on VTS with her dog was if all of the isolation patients were transferred off of VTS. (Thompson Dec. ¶ 12). However, Section 504 does not require such an intrusion into the rights of the VTS isolation patients. If a landlord is not required to move a tenant to a different apartment to accommodate a neighbor's disability, a hospital is not required to move patients receiving medically necessary care on a specialty care unit to accommodate the disability of a visitor. *See Groner*, 250 F.3d at 1046; *Temple*, 1996 WL 536710, at *2. Plaintiff's request that she be permitted to visit her father on VTS in the company of her dog would have required OhioHealth to fundamentally alter the care provided to isolation patients on the floor and was, therefore, not required.

The same would be true if Plaintiff had requested the ability to visit her father in the pre-operation area with her dog.[20] Patients are undergoing significant procedures—such as the placement of IVs, full surgical skin preparation, and regional nerve blocks—in the pre-operation area on a continuous basis. ((Schuda Dep. pp. 148-149; Schuda Dec. ¶ 7). These kinds of significant procedures create an additional risk of infection to patients about to go into surgery.

---

[20] As explained in detail in Section III.F.2.b, above, Plaintiff never requested that OhioHealth accommodate her disability by permitting her to access the pre-operation area with her dog.

(Schuda Dep. pp. 149, 151). Accordingly, permitting Plaintiff to enter the pre-operation area with her dog would have impacted the rights of the other patients in the area who were undergoing significant procedures in preparation for surgery. The rights of these patients were not required to be "sacrificed on the altar of reasonable accommodation." *Davis*, 945 F.3d at 492.

To accommodate Plaintiff's allegedly requested accommodation OhioHealth would have been required to compromise the health and welfare of other patients—whether the isolation patients on VTS or the patients being prepared for surgery in the pre-operation area. The Sixth Circuit has routinely found requested accommodations to require fundamental alterations under less serious circumstances. In *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. 2015), the Court granted summary judgement for the university because the educational institution did not have to lower it educational standards to accommodate a person with a disability. Likewise, in *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1035 (6th Cir. 1995), the Court found that waiving an age limitation to permit a 19-year-old with disabilities to play high school sports was a fundamental alternation. Here, OhioHealth would have been required to forego its safety policy, fundamentally alter the nature of its services, and compromise the level of care provided to other patients to grant Plaintiff's requested accommodation. Section 504 does not require such a fundamental alteration. As a result, OhioHealth is entitled to summary judgment on any failure to accommodate claim Plaintiff brings.

5. *Even if Plaintiff requested that OhioHealth permit her to be on the VTS floor with her dog, her requested accommodation presented a direct threat to the health or safety of others.*

OhioHealth is entitled to summary judgment on any failure to accommodate claim Plaintiff asserts because her allegedly requested accommodation would have compromised the health and safety of other OhioHealth patients. A recipient of federal funding is not required to provide a

requested accommodation under Section 504 if doing so results in a direct threat to the health and safety of others. *Doe v. Woodford Cty. Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000).

OhioHealth's Animal Visitation Infection Prevention Guidelines protected the health and safety of others. (Schuda Dep. pp. 142-143). *Pool v. Riverside Health Servs., Inc.*, 1995 WL 519129 (D. Kan. Aug. 25, 1995) is illustrative. In *Pool*, a case applying the ADA's direct threat provision, the hospital denied the disabled plaintiff's service animal access to the emergency department as she was attempting to visit a patient. The hospital's policy permitted service animals in the hospital's public areas, but excluded them from nonpublic areas, including the emergency services department. The court found the policy lawful, reasoning that the ADA and Section 504 do "not compel hospitals to jeopardize the health and safety of their patients" by allowing service animals into certain areas. *Id.* at 5. In doing so, the court stated:

> In the present case, the hospital has introduced the testimony of a physician that the animal control requirements are necessary to serve specific interests. These include "infection control, cross-exposure, allergic reactions, patient dignity and confidentiality, unpredictable behavior of the patient and the animal, and provisions for space necessary to accommodate the medical personnel and equipment to accomplish the treatment procedures."

*Id.* at *4.

So too here. Like in *Pool*, OhioHealth does not prohibit access for service animals in all areas of Riverside. Rather, the 2017 and 2018 Infection Prevention Policies generally permit service animals to be present in Riverside but contain limited exceptions. (Schuda Dep. Exs. C, H). These exceptions include areas where any patient is in isolation. (Schuda Dep. Ex. C, Sections I.D.1 and III.L.1; Ex. H, Sections I.D.1 and III.H.1). Essentially, service animals are permitted throughout the hospital except where they pose a risk to patient safety.

During Plaintiff's April 2 visit, Plaintiff's father was receiving care on a unit where more than 25% of patients were in isolation. (Schuda Dec. ¶ 8, Ex. A). OhioHealth's infection prevention practitioners had determined that the presence of an animal in an area where any patient was in isolation presented an unacceptable risk of unintentional infection. (Schuda Dep. pp. 139-140; Schuda Dep. Exs. C, H). This judgement was made with consideration of up-to-date medical evidence and had been reviewed by OhioHealth's infection control committee and approved by its quality committee. (Id.; Schuda Dec. ¶ 5).

The same is true for Plaintiff's October 8 visit.  That day, Plaintiff's father was in a pre-operating area.  Significant procedures continuously take place in the pre-operation area and no animals of any kind are permitted in the area for the surgical patient's safety. (Schuda Dep. pp. 149, 151).  After his surgery, Plaintiff's father was again transported to the VTS unit where more than 20% of the patients were in isolation. (Schuda Dec. ¶ 9, Ex. B); *see also* Schuda Dep. p. 142). Thus, just as in *Pool*, OhioHealth did not permit Plaintiff to access areas of Riverside where the presence of her dog would have created a direct threat to the health and safety of other patients. *Pool*, 1995 WL 519129, at *5. Consequently, OhioHealth did not violate Section 504 by denying Plaintiff access to VTS or the pre-operation area while accompanied by her dog.

### G. Plaintiff Cannot Establish That OhioHealth Was Deliberately Indifferent to Her Federal Rights

OhioHealth is entitled to summary judgment on all of Plaintiff's claims for compensatory damages under Section 504 because Plaintiff cannot show that OhioHealth acted toward her with a sufficiently culpable intent. *B.M. v. Bd. of Educ. of Scott Cty., Ky.*, 2008 WL 4073855, at *8 (E.D. Ky. Aug. 29, 2008); *see also Hill v. Bradley Cty. Bd. of Educ.*, 295 F. App'x 740, 743 (6th Cir. 2008). Specifically, Plaintiff is not entitled to damages under Section 504 unless she can show

that OhioHealth acted with "deliberate indifference" toward her federal rights. *See Hill*, 295 F. App'x at 743; *B.M.*, 2008 WL 4073855, at *9.

The Supreme Court has characterized deliberate indifference as a "stringent standard of fault . . . ." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). A defendant is deliberately indifferent under Section 504 only if it acts with "conscious disregard" for a plaintiff's rights. *Id.* at 407. "A showing of simple or even heightened negligence will not suffice." *Id.* The required intent exists only if either 1) the defendant actually knows that its actions will violate the plaintiff's rights or 2) such a violation is the "plainly obvious consequence" of the defendant's actions. *Brown,* 520 U.S. at 410; *see also B.M.*, 2008 WL 4073855, at *8-9 (applying *Brown* deliberate indifference standard at summary judgment stage in Section 504 case); *R.K. ex rel. J.K. v. Bd. of Educ. Of Scott Cty., Ky.*, 755 F. Supp. 2d 800, 810 (E.D. Ky. 2010) (applying *Brown* deliberate indifference standard at summary judgment stage in Section 504 case) (vacated and remanded on other grounds by *R.K. ex rel. J.K. v. Bd. of Educ. Of Scott Cty., Ky.*, 494 F. App'x 589 (6th Cir. 2012); *AP ex rel. Peterson v. Anoka-Hennepin Ind. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1147-48 (D. Minn. 2008) (applying the *Brown* deliberate indifference standard in a Section 504 case). To establish deliberate indifference in a failure to accommodate claim a plaintiff must show: "1) that the plaintiff requested the accommodation; 2) that it was "plainly obvious" that the accommodation was reasonable and necessary; and 3) if the defendant has raised the undue burden or fundamental alteration defense, that it was "plainly obvious" when the plaintiff requested the accommodation that granting it would *not* have created an undue burden on the defendant and would *not* have fundamentally altered its program." *Peterson*, 538 F. Supp. 2d at 1147-48.

1. *Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights because Ms. Larry, Ms. Thompson, and OhioHealth's pre-operation area staff are not officials capable of creating liability on behalf of OhioHealth and Dr. Schuda was not deliberately indifferent toward Plaintiff's rights.*

OhioHealth is entitled to summary judgment on all of Plaintiff's compensatory damages claims for a very simple reason: Plaintiff cannot show deliberate indifference on the part of any OhioHealth official. "Congress expressly modeled the discrimination prohibition in section 504 after the prohibitory language contained in Title VI and Title IX." *Gallagher v. Pontiac School Dist.*, 807 F.2d 75, 80 (6th Cir. 1986). Under Title IX, a recipient of federal funding is liable only for its "own official decision[s]" and not "for its employees' independent actions." *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 290-91 (1998); *see also Bose v. Bea*, 947 F.3d 983, 989-990 (6th Cir. 2020). Accordingly, "a damages remedy will not lie under Title IX unless an official who at a minimum has the authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination" and responds with "deliberate indifference." *Id.* at 290.

Title IX's requirement that damages are not available against a recipient of federal funding in the absence of an official's knowledge of discrimination and deliberate indifference toward it applies to claims under Section 504. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348-49 (11th Cir. 2012). The Sixth Circuit has not yet considered the question of who is an official for purposes of organizational liability under Section 504, but other circuits have. The Eleventh Circuit, has stated: "In the § 504 context, we conclude that an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Id.* at 350. Thus, courts have found that employees are not officials for purposes of Section 504 when "they simply aren't high enough up the org chart to permit a

reasonable inference that, through their actions, they speak for [the organization] as a whole." *Silberman v. Miami Dade Transit*, 927 F.3d 1127, 1135 (11th Cir. 2019).

The Eleventh Circuit's decision in *Silberman* is instructive. There, a bus driver refused to complete his route when the plaintiff boarded his bus with a service dog. *Silberman*, 927 F.3d at 1129. On another occasion, a bus driver admitted to intentionally passing the plaintiff at a stop because he had his service dog with him. *Id.* The Eleventh Circuit held that the transit company was not liable for damages under Section 504, however, because the bus drivers who denied the plaintiff access to their buses were not "officials." *Id.* at 1135. Similarly, a "janitorial supervisor" was not "high enough up the chain-of-command" to create liability for a school district. *Doe v. Sch. Bd. of Broward Cty., Fla*, 604 F.3d 1248, 1255 (11th Cir. 2010). And in *Welch v. City of Hartesville, Ala.*, 423 F. Supp. 3d 1277, 1284 (N.D. Ala. 2019), the court held that police officers were not "officials" for purposes of Section 504.

Here, there is no evidence that Ms. Larry, Ms. Thompson, or Ms. Puchta were officials who could subject OhioHealth to Section 504 liability. Ms. Larry was a front-line registered nurse on VTS. (Larry Dec. ¶¶ 2, 7). She was expected to follow the requirements set forth in the 2017 Infection Prevention Policy when interacting with Plaintiff on April 2. (Schuda Dep. pp. 14, 61, 123). Ms. Larry did not have authority to deviate from the 2017 Infection Prevention Policy in her interaction with Plaintiff. (Schuda Dep. pp. 14, 61; Larry Dec. ¶ 7). Like Ms. Larry, Ms. Puchta was also a front-line registered nurse on VTS. (Puchta Dec. ¶ 2). Ms. Puchta was also expected to comply with the 2018 Infection Prevention Policy when she interacted with Plaintiff on October 8. (Schuda Dep. p. 123). Ms. Puchta did not have authority to deviate from the 2018 Infection Prevention Policy in her October 2018 interaction with Plaintiff. (Schuda Dep. p. 123; Puchta Dec. ¶ 7). Further, Ms. Thompson, though a manager on VTS, did not have authority to deviate from

the requirements on the 2017 Infection Prevention Policy on April 2. (Thompson Dec. ¶ 11). Likewise, OhioHealth's pre-operation area staff did not have authority to deviate from the requirements of the 2018 Infection Prevention Policy when interacting with Plaintiff on October 8. (Schuda Dec. ¶ 12). Without authority to deviate from the requirements of the applicable Infection Prevention Policy, an OhioHealth employee cannot be someone "who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a key decision point in the administrative process." *Liese*, 701 F.3d at 350. Consequently, Ms. Larry, Ms. Puchta, Ms. Thompson, and OhioHealth's pre-operation area staff were not officials capable of subjecting OhioHealth to liability under Section 504.

Plaintiff will point to Dr. Schuda as an OhioHealth official for purposes of Section 504, and she is. However, as fully detailed in Section III.G.2.a, above, Dr. Schuda did not respond to Plaintiff's concerns regarding access to VTS, as communicated through Ms. Burkholder, with deliberate indifference. Instead, Dr. Schuda engaged Ms. Burkholder in a dialog about the nature of VTS and potential ways OhioHealth could help Plaintiff visit her father. (Schuda Dep. Ex. N). Indeed, Ms. Burkholder described Dr. Schuda's "prompt attention to [her] concerns despite [Dr. Schuda's] busy schedule" as "quite admirable." (Id.). And when Ms. Burkholder "formally requested" an accommodation on behalf of Plaintiff for the duration of her father's April 2018 hospitalization on VTS, Dr. Schuda sought legal advice and responded in approximately one week despite the fact that Ms. Burkholder's accommodation request expired by its terms on April 9 due to Mr. Hedrick's discharge. (Schuda Dep. pp. 90-91; Schuda Dep. Ex. N). Though Plaintiff may not have been happy with Dr. Schuda's response, it was not deliberately indifferent to her federal rights. Consequently, because no OhioHealth official was deliberately indifferent to Plaintiff's

rights, OhioHealth is entitled to summary judgement on all of Plaintiff's claims for compensatory damages.

> 2. *Plaintiff cannot show that OhioHealth was deliberately indifferent toward her federal rights when it denied her access to the VTS unit and the pre-operation area in the company of her dog.*

Even if Ms. Larry, Ms. Puchta, Ms. Thompson, or OhioHealth's pre-operation area staff is an "official" for purposes of Section 504, OhioHealth is still entitled to summary judgment on Plaintiff's claims for compensatory damages because Plaintiff cannot show that any OhioHealth employee was ever deliberately indifferent to her federal rights. Initially, Plaintiff cannot show that any OhioHealth employee acted with conscious disregard for her rights. *See Brown*, 520 U.S. at 407. The undisputed evidence shows that OhioHealth personnel denied Plaintiff access to the VTS unit and the pre-operation area while accompanied by her dog because of the restrictions on animal access to those areas under the 2017 and/or 2018 Infection Prevention Policies and to ensure the safety of the patients being treated in those areas. (Schuda Dep. pp. 139-143, 149-151; Schuda Dep. Ex. C, Sections I.D.1 and III.L.1; Ex. H, Sections I.D.1 and III.H.1). These motivations show neither indifference nor conscious disregard toward Plaintiff's rights. *See B.M.*, 2008 WL 4073855, at *9 (school was not deliberately indifferent under Section 504 where it rejected requested accommodations because of "the viable concerns for cost and liability").

Additionally, there is no evidence that Ms. Larry, Ms. Thompson, OhioHealth's personnel in the pre-operation area, or Ms. Puchta had actual knowledge that denying Plaintiff access to the VTS unit or the pre-operation area would violate Plaintiff's federal rights. This is the case because, as explained in Section III.D, above, denying Plaintiff access to these areas of Riverside did not violate her rights in any way; Plaintiff was denied access to these areas of the hospital while accompanied by her dog because OhioHealth personnel were complying with the 2017 or 2018 Infection Prevention Policy, as applicable, and seeking to ensure the safety of the other patients in

those areas, not solely by reason of her disability. (Schuda Dep. pp. 139-143, 149-151; Schuda Dep. Ex. C, Sections I.D.1 and III.L.1; Ex. H, Sections I.D.1 and III.H.1). Further, even if denying Plaintiff access to VTS and the pre-operation area while accompanied by her dog did violate her federal rights—which it did not—there is absolutely no evidence that Ms. Larry, Ms. Thompson, OhioHealth's personnel in the pre-operation area, or Ms. Puchta knew that denying Plaintiff access to their respective areas of Riverside would violate Plaintiff's rights, and yet still chose to exclude her. *K.K. ex rel. L.K. v. Pittsburgh Pub. Sch.*, 590 F. App'x 148, 153 (3d Cir. 2014) (explaining that deliberate indifference "requires actual knowledge; allegations that one would have or should have known will not satisfy the knowledge prong") (internal quotation marks omitted).

Neither can Plaintiff show that a violation of Plaintiff's rights under the Rehabilitation Act was a "plainly obvious consequence" of OhioHealth's decision to deny Plaintiff access to the VTS unit and the pre-operation area while accompanied by her dog. Plaintiff interacted with Ms. Larry and Ms. Puchta regarding accessing the VTS floor with her dog at times when there were significant numbers of patients on the unit receiving care in isolation. (Schuda Dec. ¶¶ 8, 9, Exs. A, B). VTS nurses are constantly aware of the number of isolation patients on the unit because of the resulting special safety obligations. (Thompson Dec. ¶ 10). Under OhioHealth's 2017 and 2018 Infection Prevention Policies, no animals were permitted in areas where any patient was in isolation. (Schuda Dep. pp. 139-143; Schuda Dep. Ex. C, Sections I.D.1 and III.L.1; Ex. H, Sections I.D.1 and III.H.1). Similarly, the pre-operation area at Riverside is where 90 patients per business day are prepared for surgery; IVs are placed, full surgical skin preparation is performed, and regional anesthesia is administered. (Schuda Dep. pp. 148-149; Schuda Dec. ¶ 7). Thus, Plaintiff sought entrance to areas of Riverside where patients are exceptionally sick or especially vulnerable to infection. (Schuda Dep. pp. 149-150). Thus, given the high patient acuity in the areas

Plaintiff sought to access with her dog, it was not "plainly obvious" to Ms. Larry, Ms. Thompson, Ms. Puchta, or OhioHealth's pre-operation personnel that denying Plaintiff access to their respective areas would violate her federal rights. *See Brown*, 520 U.S. at 415 (explaining that the violation of a federal right must be "plainly obvious" in light of the challenged decision given the facts considered by the decisionmaker); *B.M.*, 2008 WL 4073855, at *9 (school was not deliberately indifferent under Section 504 where it rejected requested accommodations because of "the viable concerns for cost and liability").

Because Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights in conjunction with the April and October 2018 denial of access to VTS or the October 8 denial of access to the pre-operation area, OhioHealth is entitled to summary judgement on Plaintiff's claims for compensatory damages related to those events.

3. *Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights when it did not accommodate her by permitting her to access the VTS unit and the pre-operation area with her dog.*

OhioHealth is entitled to summary judgment on Plaintiff's claims for compensatory damages with regard to her allegations that OhioHealth failed to accommodate her disability by permitting her to be accompanied by her dog on the VTS floor and in the pre-operation area because Plaintiff cannot show that OhioHealth was deliberately indifferent toward her federal rights in its denial of her requested accommodation.

a. OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it refused to accommodate Plaintiff in April 2018 by permitting her on the VTS floor with her dog.

Plaintiff cannot show that OhioHealth's refusal to alter its 2017 Infection Prevention Policy and permit her on the VTS floor with her dog in April 2018 was deliberately indifferent to her federal rights for four reasons. First, it was not "plainly obvious" that Plaintiff's requested accommodation—waiving the 2017 Infection Prevention Policy's prohibition of animals in areas

where patients were in isolation—was reasonable. *See Peterson*, 538 F. Supp. 2d at 1147-48. Neither Ms. Larry nor Ms. Thompson had the authority to deviate from the 2017 Infection Prevention Policy. (Schuda Dep. pp. 14, 61; Thompson Dec. ¶ 11; Larry Dec. ¶ 7). And, as explained in Section III.F.5, above, given the presence of isolation patients on VTS at the time Plaintiff sought access with her dog, Ms. Larry and Ms. Thompson reasonably believed that refusing Plaintiff access with her dog was necessary to protect those patients' safety. (Thompson Dec. ¶¶ 9, 10, 11, 16; Larry Dec. ¶¶ 3, 4, 5, 6). What is more, to enable Plaintiff to remain on VTS with her dog on April 2, Ms. Thompson would have been required to transfer the nine isolation patients to another unit. (Thompson Dec. ¶ 12). That would have required finding an appropriate unit for the transfer, ensuring the unit had space for the transferring patient, obtaining authorization for the transfer and new orders from the transferring patient's physician, informing the patient of the reason for the transfer, and physically carrying out the transfer. (Thompson Dec. ¶ 13). It simply was not "plainly obvious" to Ms. Larry and Ms. Thompson that Plaintiff's accommodation, if requested, was reasonable.

Second, it was not plainly obvious to OhioHealth that altering its 2017 Infection Prevention Policy to enable Plaintiff to access the VTS floor with her dog was necessary. *See Peterson*, 538 F. Supp. 2d at 1147-48. Plaintiff does not dispute that she visited her father on April 3 *without* her dog and had a normal visit during which she spoke to her father, ascertained his condition and plan of treatment, and told him that she loved him. (Plaintiff Dep. p. 78, 195-196). Plaintiff's undisputed ability to effectively visit her father without her dog makes the necessity of modifying the 2017 Infection Prevention Policy anything but "plainly obvious."

Third, it was not plainly obvious to OhioHealth in April 2018 that granting Plaintiff access to VTS with her dog would not have required a fundamental alteration of its VTS floor operations.

71

*See Peterson*, 538 F.Supp.2d at 1147-48. At the time Plaintiff requested access to the VTS floor with her dog, more than 25% of the patients receiving care on the unit were in isolation and the 2017 Infection Prevention Policy prohibited all animals in any area where any patient was in isolation. (Schuda Dec. ¶ 8, Ex. A; Schuda Dep. pp. 139-140; Schuda Dep. Ex. C). This restriction on animal access was a judgement of OhioHealth's infection prevention practitioners based on their assessment of the risk of unintentional infection and had been reviewed by OhioHealth's Infection Control Committee and approved by its Quality Committee. (Id.). Consequently, to grant Plaintiff's request, the VTS patients in isolation would have had to be transferred to other floors or Mr. Hedrick would have had to been moved to another floor where patients were not in isolation. (Thompson Dec. ¶¶ 12, 13, 15). Both of these options would have fundamentally altered the operations of the VTS floor and the care provided to the impacted patients because VTS provides specialty care not generally available in other areas of Riverside. (Thompson Dec. ¶ 4).

Finally, Plaintiff testified that Dr. Schuda's April 16 response to Ms. Burkholder's April 6 email shows deliberate indifference with regard to OhioHealth's April 2018 refusal to permit her on the VTS floor. Plaintiff is wrong. Plaintiff testified as follows:

> Q: How was OhioHealth deliberately indifferent to its obligations under the Rehabilitation Act and your rights?
>
> A: Again, up to April 2nd, 2018 when Ms. Burkholder e-mailed Dr. Schuda and Dr. Schuda waited eleven days to respond and then stated that the—the issue was moot because my father was discharged, which—and then—yes.
>
> Q: So Dr. Schuda's response to Ms. Burkholder's e-mail in April of 2018 is your evidence of deliberate indifference, correct?
>
> A: Yes.
>
> Q: Anything else?
>
> A: Just—that's it.

(Plaintiff Dep. pp. 130-131). Neither the timing nor substance of Dr. Schuda's response to Ms. Burkholder's April 6 email show deliberate indifference.

The email exchange between Dr. Schuda and Ms. Burkholder must be viewed in context. Ms. Burkholder first contacted Riverside concerning Plaintiff's ability to access the VTS floor with her dog on April 4. (SAC ¶ 36). Between April 4 and April 6, Ms. Burkholder and Dr. Schuda spoke on the phone regarding Plaintiff's desire to access VTS with her dog and other ways OhioHealth could accommodate her. (Schuda Dep. pp. 68-69; Schuda Dep. Ex. N). On those calls, Dr. Schuda suggested that OhioHealth staff could assist Plaintiff in accessing the VTS floor without her dog, if necessary, and the possibility of working with Mr. Hedrick's physicians to see if it would be medically appropriate to move him to another part of the hospital freely accessible to animals`. (Schuda Dep. Ex. N). When Ms. Burkholder emailed Dr. Schuda on Friday, April 6, she thanked Dr. Schuda for "all of the communication" they had engaged in regarding service dog access and her "prompt attention to [her] concerns despite [Dr. Schuda's] very busy schedule." (Schuda Dep. Ex. N). Ms. Burkholder's April 6 email asked that Plaintiff be permitted to access the VTS floor with her dog "for the duration of [Mr. Hedrick's] stay at Riverside" and requested that Dr. Schuda respond in writing "at the earliest possible time." (Schuda Dep. Ex. N). Dr. Schuda sought guidance from OhioHealth's Office of General Counsel concerning how to respond to Ms. Burkholder's email. (Schuda Dep. pp. 90-91). The following Monday, on April 9, Plaintiff's father was discharged from Riverside. (SAC ¶46). As a result, Ms. Burkholder's request for an accommodation, which was for the "duration" of Mr. Hedrick's hospitalization expired by its own terms on April 9. (Schuda Dep. Ex. N). Dr. Schuda nevertheless responded to Ms. Burkholder on Monday, April 16, after being advised by the Office of General Counsel. (Schuda Dep. p. 91; Schuda Dep. Ex. N).

The communication between Dr. Schuda and Ms. Burkholder does not show that OhioHealth was deliberately indifferent to Plaintiff's federal rights. On the contrary, it shows that Dr. Schuda promptly responded to the concerns raised by Ms. Burkholder and was trying to reasonably work with her to enable Ms. Hedrick to access the VTS unit. (Schuda Dep. Ex. N). Further, as Dr. Schuda testified, any delay in her response to Ms. Burkholder's April 6 email was caused not by indifference or conscious disregard, but by Dr. Schuda's diligence in seeking legal advice concerning Plaintiff's request. (Schuda Dep. p. 91). Dr. Schuda's effort to obtain legal review of Plaintiff's request is inconsistent with deliberate indifference to Plaintiff's federal rights. *See Hill v. Bradley Cty. Bd. of Ed.*, 2007 WL 4124495, at *19 (E.D. Tenn. Nov. 19, 2007) (holding that deliberate indifference is not present when an individual attempts to take action in response to concerns raised, even if that action is unsuccessful) *affirmed Hill*, 295 F. App'x at 740. To the contrary, it shows Dr. Schuda's and OhioHealth's concern that Plaintiff's request be handled in a legally compliant way.

> b. <u>OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it refused to accommodate Plaintiff on October 8, 2018 by permitting her in the pre-operation area with her dog.</u>

Plaintiff cannot show that OhioHealth's refusal to alter its 2018 Infection Prevention Policy and permit her in the pre-operation area with her dog on October 8, 2018 was deliberately indifferent to her federal rights for three reasons. First, Plaintiff did not request that OhioHealth accommodate her by permitting her in the pre-operation area with her dog. According to Plaintiff, when OhioHealth staff told her that she could not take her dog in the pre-operation area, she said "okay." (Plaintiff Dep. pp. 92-93). There is no evidence that OhioHealth staff knew that Plaintiff considered her dog a service dog or that Plaintiff ever informed them of this fact or otherwise requested that the applicable policy be modified to permit her in the pre-operation area with her dog. (Id.). Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights

by failing to accommodate her disability when she never requested an accommodation. *Peterson*, 538 F. Supp. 2d at 1147-48.

Second, even if Plaintiff did request an accommodation, it was not plainly obvious to OhioHealth that altering its 2018 Infection Prevention Policy to enable Plaintiff to access the pre-operation area with her dog was necessary. *See Peterson*, 538 F. Supp. 2d at 1147-48. It is undisputed that when OhioHealth staff told Plaintiff she was not permitted to bring her dog into the pre-operation area, Plaintiff's sister took the dog outside and Plaintiff entered the area without her dog where she visited with her father. (Plaintiff Dep. p. 93, 196-197; Colon Dep. pp. 23-24). Again, Plaintiff's undisputed ability to meaningfully visit her father without her dog makes the necessity of modifying the 2018 Infection Prevention Policy anything but "plainly obvious."

Third, even if Plaintiff did request an accommodation, it was not plainly obvious to OhioHealth on October 8 that permitting Plaintiff access to the pre-operation area with her dog would not have required a fundamental alteration of the care provided in the pre-operation area. *See Peterson*, 538 F.Supp.2d at 1147-48. Patients are continuously undergoing significant procedures in the pre-operation area such as receiving IVs, full surgical skin preparation, and regional anesthesia. (Schuda Dep. pp. 148-149). Because these kinds of significant procedures constantly take place in the pre-operation area, in order to avoid infection and keep pre-surgical patients safe, no animals of any kind, whether service animal or otherwise, are permitted in the area. (Schuda Dep. pp. 149, 151; Schuda Dep. Ex. H, Section III.H.3). To permit Plaintiff to access the pre-operation area with her dog would have been to contravene the medical judgment of OhioHealth's infection prevention practitioners and compromise the safety of the patients in the area undergoing significant procedures. (Schuda Dep. pp. 140, 149, 151). The rights of third parties such as the patients being prepared for surgery need not be sacrificed on the altar of reasonable

accommodations. *Davis*, 945 F.3d at 492. Consequently, OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it did not alter its 2018 Infection Prevention Policy to permit Plaintiff in the pre-operation area with her dog on October 8.

> c. <u>OhioHealth was not deliberately indifferent to Plaintiff's federal rights when it refused to accommodate Plaintiff in October 2018 by permitting her on the VTS floor with her dog.</u>

Plaintiff cannot show that OhioHealth's refusal to alter its 2018 Infection Prevention Policy and permit her on the VTS unit with her dog on October 8 was deliberately indifferent to her federal rights for three reasons. First, Plaintiff did not request that OhioHealth accommodate her by permitting her on the VTS unit with her dog in October 2018. By Plaintiff's own account, when she spoke to Ms. Puchta, her father's nurse on October 8, she told her that she had personal items to deliver to her father and that her dog was her service dog. (Plaintiff Dep. p. 95-56). In response, Ms. Puchta told her that she was not permitted to bring her dog to the VTS floor, and Plaintiff agreed to meet Ms. Puchta in the lobby to give her Mr. Hedrick's personal items. (Id.). Plaintiff never made a request to Ms. Puchta or anyone else in October 2018 that OhioHealth's policy be modified to permit her to access the VTS unit with her service dog. Plaintiff cannot show that OhioHealth was deliberately indifferent to her federal rights by failing to accommodate her disability in October 2018 when she never requested an accommodation. *Peterson*, 538 F.Supp.2d at 1147-48.

Second, it was not plainly obvious to OhioHealth that altering its 2018 Infection Prevention Policy to enable Plaintiff to access the VTS floor with her dog was necessary. *See Peterson*, 538 F.Supp.2d at 1147-48. Plaintiff previously visited her father on the VTS unit on April 3 *without* her dog and had a normal visit during which she spoke to her father, ascertained his condition and plan of treatment and told him that she loved him. (Plaintiff Dep. p. 78, 195-196). Plaintiff had also visited with her father in the pre-operation area just a few hours before she sought to access

the VTS unit on October 8. (Plaintiff Dep. p. 93, 196-197; Colon Dep. pp. 23-24). Plaintiff's undisputed ability to meaningfully visit her father without her dog makes the necessity of modifying the 2018 Infection Prevention Policy anything but "plainly obvious."

Third, it was not plainly obvious to OhioHealth in October 2018 when Plaintiff requested access to the VTS floor that granting that request would not have required a fundamental alteration of its VTS floor operations. *See Peterson*, 538 F.Supp.2d at 1147-48. At the time Plaintiff requested access to the VTS floor with her dog, more than 20% of the patients receiving care on the unit were in isolation and the 2018 Infection Prevention Policy prohibited all animals in any area where any patient was in isolation. (Schuda Dec. ¶ 9, Ex. B); Schuda Dep. pp. 140-143; Schuda Dep. Ex. H). This restriction on animal access was a judgement of OhioHealth's infection prevention practitioners based on their assessment of the risk of unintentional infection and had been reviewed by OhioHealth's Infection Control Committee and approved by its Quality Committee. (Id.). Consequently, to grant Plaintiff's request, the VTS patients in isolation would have had to be moved to other floors. Moving other patients off a unit their physician had determined was medically necessary, however, would have fundamentally altered the operations of the VTS floor and the care provided to the impacted patients as VTS provides specialty care not generally available in other areas of Riverside. (Thompson Dec. ¶ 4). *See Groner*, 250 F.3d at 1046; *Temple*, 1996 WL 536710, at *2. Accordingly, Plaintiff cannot demonstrate that OhioHealth was deliberately indifferent to her federal rights and her claims for compensatory damages must be dismissed.

## IV.    CONCLUSION

For the reasons set forth herein, OhioHealth respectfully requests that the Court enter summary judgment in its favor on all claims asserted by Plaintiff Sara Hedrick in her Second Amended Complaint.

Respectfully submitted,

*/s/  Jeremy Hart*
M. J. Asensio (0030777), Trial Attorney
Jeremy Hart (0087744), Of Counsel
BAKER & HOSTETLER LLP
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
(614) 228-1541
(614) 462-2616 (facsimile)
masensio@bakerlaw.com
jhart@bakerlaw.com

*Attorneys for Defendant OhioHealth*
*Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 18, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Jeremy Hart*
Jeremy Hart
