UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SARA HEDRICK,

    Plaintiff,

v.

OHIOHEALTH CORPORATION,

    Defendant.

Case No. 2:19-cv-1326
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

## OPINION AND ORDER

The matter before the Court is Defendant OhioHealth Corporation's ("OhioHealth" or "Defendant") motion for summary judgment, (ECF No. 94), and Plaintiff Sara Hedrick's ("Ms. Hedrick" or "Plaintiff") motion for summary judgment (ECF No. 95). Both motions are fully briefed. (ECF Nos. 107, 114, 118, 120). Also before the Court are Plaintiff's two motions for leave to file, (ECF Nos. 123, 129), which are also fully briefed (ECF Nos. 125, 128, 130, 131). For the reasons that follow, Defendant's motion for summary judgment is **GRANTED**, (ECF No. 94), Plaintiff's motion for summary judgment is **DENIED**, (ECF No. 95), Plaintiff's first motion for leave to file is **DENIED**, (ECF No. 123), and Plaintiff's second motion for leave to file is **GRANTED** (ECF No. 129).

## I.

OhioHealth Riverside Methodist Hospital ("Riverside" or "Hospital") has a policy: service dogs, though allowed in the general areas of the hospital, are not allowed in certain other areas including patient isolation rooms, and the pre-operation area. (Schuda Dep., Def. Ex. C, ECF No. 94-2, PageID 1238, 1244–47. This policy is found in OhioHealth's 2017 Animal Visitation Infection Prevention Guidelines. (*Id.* at PageID 1208, 1125, 1243). These guidelines were developed by medical professionals who specialize in infection prevention; they were designed

using guidance and scholarly articles on the presence of animals in hospitals. (Schuda Dec. at ¶ 5, ECF No. 94-4).

### A. April 2018

On April 1, 2018, Plaintiff's father, Thomas Hedrick, was admitted to Riverside for his stroke related symptoms. (Hedrick Dep., ECF No. 94-6, PageID 1323). The following day, April 2, Mr. Hedrick was transferred to the Vascular Thoracic Step-Down ("VTS") floor of the hospital. (*Id.* at PageID 1324; Schuda Dep. at 98, ECF No. 94-2, PageID 1224). VTS is an intermediate care unit. (Schuda Dep. at PageID 1224). The unit is for surgical patients and patients who are stable enough not to be in intensive care but not yet stable enough for a general unit. (Thompson Dec. at ¶ 5, ECF No. 94-3). Patients on the VTS floor are sick and suffering from serious medical conditions, (Pl. Dep. at 64, ECF No. 94-1, PageID 1154; Schuda Dep. at 149–50, ECF No. 94-2, PageID 1238–39), they frequently have "large surgical wounds, tubes and drains," and for that reason many of them are in isolation. (Schuda Dep. at PageID 1239). On April 2, 2018, nine patients on the VTS floor were in isolation, including the patient in the room next to Mr. Hedrick. (Schuda Dec. at ¶ 8, ECF No. 94-4).

On April 2, 2018, Plaintiff Sara Hedrick entered the hospital with her service dog. (Pl. Dep. at 63, 66, ECF No. 94-1, PageID 1153, 1155). She had come to visit her father. (*Id.* at 1155). Ms. Hedrick asserts that she has "major depressive disorder, anxiety, autistic . . . , dissociative disorder, hypoglycemia, low blood pressure, PTSD." (Pl. Dep. at 27; *see also* Schwartz Letter, ECF No. 95-1 ("She presented with symptoms of PTSD, anxiety and depression.")). At approximately 3:55pm, Ms. Hedrick and her service dog arrived on the VTS floor. (Pl. Dep. at 66, ECF No. 94-1, PageID 1155).

2

Ms. Hedrick was with her father when a nurse came in and told her that she could not have her dog in the room. (Pl. Dep. at 69, ECF No. 94-1, PageID 1158). Ms. Hedrick responded that the dog was a service dog and was permitted. (*Id.* at PageID 1159). Ms. Hedrick then asked why her service dog was not allowed on that floor, to which the nurse explained that this was a special unit. (*Id.*) Ms. Hedrick asked the nurse to clarify, after which the nurse went to consult with her manager. (*Id.*) The nurse asked her manager whether the service dog was permitted, and the manager referred her to the 2017 Animal Visitation Infection Prevention Guidelines, which state that animals are not permitted in areas where any patients are in isolation. (Thompson Dec. at ¶ 9, ECF No. 94-3, PageID 1266, 1271). The manager thus confirmed to the nurse that the service dog was not permitted to be on the VTS floor. (*Id.* at ¶ 11). The nurse returned to Ms. Hedrick and stated that she would have to leave the floor, as the dog was not allowed. (Pl. Dep. at 72, ECF No. 94-1, PageID 1160). After leaving the floor, Ms. Hedrick spoke with guest services, which confirmed that VTS was a special unit. (*Id.* at PageID 1157–58). According to Ms. Hedrick, she went home in tears. (*Id.* at PageID 1158).

The next day, April 3, Ms. Hedrick returned to the hospital and visited her father accompanied by her sister, but not her service dog. (*Id.* at PageID 1162). While visiting her father in the hospital, Ms. Hedrick felt "very anxious, scattered, felt out of place." (*Id.*)

Ms. Hedrick did not visit her father for the remainder of his stay at the hospital. (*Id.* at PageID 1163). However, on Friday, April 6, a Ms. Burkholder emailed Dr. Schuda, the medical director for patient services, and wrote "I am formally asking for an accommodation for the family of Thomas Hedrick . . . to allow visitation by his daughter accompanied by her service dog." (Schuda Dec., Def. Ex. N, ECF No. 94-2, PageID 1259). Mr. Hedrick was discharged the following

3

Monday, (April 11). Dr. Schuda responded on April 16, after Mr. Hedrick was discharged. Dr. Schuda noted that the issue was moot but suggested the use of staff as an accommodation. (*Id.*).

### B. October 2018

On October 3, an ambulance rushed Mr. Hedrick to the hospital's emergency department. (Pl. Dep. at 82–83, ECF No. 94-1, PageID 1164–64; Hedrick Dep. at 82, ECF No. 94-6, PageID 1313). Ms. Hedrick and her support dog arrived thereafter. (Pl. Dep. at PageID 1165). Initially, a nurse stopped Ms. Hedrick from proceeding to see her father in the emergency department, inquiring about the service animal. (*Id.*) The nurse then went to check on her father and see if the dog was permitted in the emergency department. (*Id.*; Bullock Dec. at ¶ 3, ECF No. 94-9). While the nurse was away, Ms. Hedrick went to the security desk to inquire about the delay, and security directed her to guest services. (Pl. Dep. at 83–84, ECF No. 94-1, PageID 1165–66). At guest services, Ms. Hedrick again inquired about the delay. (*Id.* at PageID 1166). At this point the nurse found Ms. Hedrick and took both her and her service dog to see her father in the emergency department. (*Id.*; Bullock Dec. at ¶¶ 6–7, ECF No. 94-9).

Ms. Hedrick underwent surgery on October 8. (Hedrick Dep. at 83, ECF No. 94-6, PageID 1314). Before surgery, Mr. Hedrick was taken to the pre-operation area for preparation. Ms. Hedrick and her sister were outside the pre-operation area with Ms. Hedrick's service dog. (Colon Dep. at 23, ECF No. 94-10, PageID 1337). An employee told Ms. Hedrick that she could not bring her dog into the pre-operation area. (*Id.*; Pl. Dep. at 92–93, ECF No. 94-1, PageID 1170–71). Ms. Hedrick did not tell the employee that her dog was a service dog, instead saying "okay." (Pl. Dep. at PageID 1170–71). Ms. Hedrick's sister looked after her service dog while Ms. Hedrick went into the pre-operation area to see her father. (Colon Dep. at 24, ECF No. 94-10, PageID 1338).

4

After surgery, Mr. Hedrick was transferred to the VTS floor. (Hedrick Dep. at 87, ECF No. 94-6). Ms. Hedrick called her father from the hospital lobby and told him that she would come up and visit; he reminded her that she could not bring her service dog. (Pl. Dep. at 93–94, ECF No. 94-1, PageID 1171–72). Ms. Hedrick then spoke with her father's nurse who explained that VTS was a special unit and dogs were not allowed. (*Id.* at PageID 1172). Ms. Hedrick stated that she had items for her father, and the nurse agreed to deliver them to Mr. Hedrick. (*Id.*). Ms. Hedrick did not visit again for the remainder of her father's recovery at the hospital. (*Id.* at PageID 1176).

### C. Procedural Posture

On April 9, 2019, Plaintiff Sara Hedrick and then-Plaintiff Thomas Hedrick filed suit against OhioHealth in this Court. (ECF No. 1). Thomas Hedrick is no longer a party to this case. In her Second Amended Complaint, Plaintiff Sara Hedrick alleges that Defendant OhioHealth violated Section 504 of the Rehabilitation Act, seeking damages and other relief. (ECF No. 73, PageID 862, 865–66). Both parties move for summary judgment. (ECF Nos. 94–95).

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is

5

a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

**III.**

This case involves claims under the Rehabilitation Act of intentional discrimination and failure to accommodate. Plaintiff alleges that OhioHealth violated her rights under the Rehabilitation Act by refusing to allow her service dog into two sensitive areas of the hospital: the VTS floor and the pre-operation area. This case does not involve admission of a service dog into the general areas of the hospital, as Plaintiff does not dispute that her service dog was allowed in those areas. The Rehabilitation Act of 1973 states: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance  . . . ." 29 U.S.C. § 794(a).

A. **Intentional Discrimination**

6

First, Plaintiff's intentional discrimination claim. Plaintiff has not presented sufficient evidence from which a reasonable jury could find that OhioHealth allegedly discriminated against Plaintiff "solely" because of her disability. 29 U.S.C. § 794(a). Plaintiff concedes that this standard of causation—solely because of disability—sets a high bar as "the Rehabilitation Act permits . . . a decision *because of* handicap if the handicap is not the sole reason for the decision." (Pl. Reply at 13, ECF No. 120) (citing, *e.g.*, *Burns v. City of Columbus, Dep. of Pub. Safety*, 91 F.3d 836, 841–42 (6th Cir. 1996)). A plaintiff may establish a discrimination claim through a showing of indirect or direct discrimination. *Gohl v. Livonia Public Schools School District*, 836 F.3d 672, 682 (6th Cir. 2016).

Courts analyze Retaliation Act discrimination claims under a version of the *McDonnell Douglas* test. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184–85 (6th Cir. 1996). Plaintiff must establish that she: (1) is "disabled," (2) is "otherwise qualified" to access these areas, (3) is being "excluded . . . because of [her] disability or handicap," and (4) the program was federally funded. *Gohn*, 836 F.3d at 682. If established, the burden shifts to the defendant to offer a legitimate reason for its actions. *Id.* at 683 (citing *Monette*, 90 F.3d at 1179, 1185). The burden then shifts back to plaintiff to establish that the proffered reason is "mere pretext for unlawful discrimination." *Id.* (citing *Monette*, 90 F.3d at 1186–87).

Plaintiff argues that OhioHealth "denied her access to areas where persons without service animal handlers [sic] were allowed to go." (Pl. Resp., ECF No. 114, PageID 2456). According to Plaintiff, "[a]s a service animal handler, she is a member of a protected class. OhioHealth denied her access as a service animal handler. It treated her better when she acceded to its demands to visit without Rufus and as a non-service animal handler." (*Id.*) The Court will assume arguendo that Plaintiff has satisfied her prima facie case.

7

The burden thus shifts to OhioHealth to explain why it only allowed Plaintiff to enter the VTS floor and pre-operation area unaccompanied by her service dog. Regarding Plaintiff's visit to the VTS floor, OhioHealth explains: "OhioHealth's personnel were seeking to ensure the safety of the patients receiving treatment on the VTS floor—especially the patients in isolation—and to adhere to its 2017 Infection Prevention Policy." (Def. Mot., ECF No. 94, PageID 1078) (citing Schuda Dep. at PageID 1240; Larry Dec. ¶¶ 3–6; Thompson Dec. ¶¶ 9–11). Regarding the pre-operation area, OhioHealth similarly explains, "OhioHealth's personnel were seeking to ensure the safety of patients being prepared for surgery and to adhere to its 2018 Infection Prevention Policy." (*Id.* at PageID 1082) (citing Schuda Dep. at PageID 1237–38, 1240). Plaintiff argues: "Patient safety does not justify this disparate treatment." The Court cannot agree. A hospital's decision to refuse the admission of an animal into areas where its trained medical professionals have concluded that the animal's presence is not conductive to the health of its patients is legitimate.

Plaintiff offers now-18-year-old CDC environmental guidelines in an attempt to delegitimize the hospital's reasoning but fails to connect these guidelines to this situation. These guidelines state, broadly, that scientific evidence does not indicate that a clean and healthy service animal poses more of threat to patient health than people do, and that service animals generally should not be excluded from hospitals. (Guidelines for Environmental Infection Control in Health-Care Facilities (2003), ECF No. 95-7, PageID 1546–47). But these guidelines also state that it is appropriate to exclude service animals from such areas as operating rooms and special care areas. (*Id.*) Importantly, that section begins: "Although this section provides an overview about service animals in health-care settings, it cannot address every situation or question that may arise . . . ." (*Id.*) These guidelines do not address VTS floors with patients in isolation or pre-operation areas,

8

and Plaintiff does not offer any evidence, such as expert testimony, to connect these guidelines to this particular situation or otherwise counter Defendant's evidence.

The medical professionals who specialize in infection prevention at OhioHealth decided that while service dogs could enter the general areas of the hospital, they could not enter the VTS floor or the pre-operation area. This policy was established to protect the health of the patients. And, the employees that interacted with Plaintiff acted according to this policy. OhioHealth has presented a legitimate non-discriminatory reason for excluding Plaintiff's service dog from areas where people are preparing for surgery or in medically prescribed isolation.

The burden thus shifts back to Plaintiff to prove that patient health and safety is just a pretext for discriminating against her on account of disability. However, Plaintiff does not argue pretext. Instead, Plaintiff argues "OhioHealth's reasons are not legitimate and are discriminatory. As such, pretext does not apply." (Pl. Resp., ECF No. 114, PageID 2457). Because Plaintiff explicitly declines to argue pretext, she cannot satisfy the *McDonnell Douglas* test.

Plaintiff's only other option would be to argue a direct case of discrimination. In such cases, the plaintiff must produce evidence showing "animus" was the "but-for cause of the challenged act." *Gohl*, 836 F.3d at 683. However, Plaintiff has not produced any evidence that OhioHealth was acting with animus against Plaintiff on account of disability when it refused admittance of her service dog to the more sensitive areas of the hospital.

Simply put, based on the evidence presented, no reasonable jury could conclude that plaintiff's stated mental disabilities were the sole reason that OhioHealth would not allow her service dog to enter the VTS floor or pre-operation area. OhioHealth is thus entitled to summary judgment on Plaintiff's claim of intentional discrimination.

B. **Failure to Accommodate**

Plaintiff's other claim is that OhioHealth failed to accommodate her disability. In addition to claims of intentional discrimination, the Rehabilitation Act created a cause of action for failures to accommodate. Section 504 of the Rehabilitation Act, "requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that [OhioHealth] offers." *Alexander v. Chaote*, 469 U.S. 287, 301 (1985). There are exceptions. Relevant here, the reasonable modifications required by the statute do not include those modifications that would work a "fundamental alteration" to the nature of the benefit—here the VTS floor and pre-operation area. *Southern Community College v. Davis*, 442 U.S. 397, 410 (1979).

OhioHealth submits that "[p]ermitting Plaintiff to bring her dog onto VTS or into the pre-operation area would have required a fundamental alteration of the services OhioHealth provided in those areas and jeopardized the welfare of patients receiving treatment in those areas." (Def. Mot., ECF No. 94, PageID 1105). In support, OhioHealth presents evidence that during the relevant time periods, there were an average of eight isolation patients at VTS, including one that neighbored Plaintiff's father. (Schuda Dec. at ¶¶ 8–9, ECF No. 94-4). "The patients treated on VTS who are in isolation are very sick and more susceptible to infection than other patients." (Thompson Dec. at ¶ 10, Def. Ex. G, ECF No. 94-3). Thus, under the hospital's Animal Visitation Infection Prevention Guidelines, "[a]nimals are not permitted in areas where any patient(s): (1) are in isolation[.]" (*Id.* at PageID 1270, 1273). As already mentioned, these guidelines were developed by OhioHealth's medical professionals specialized in infection prevention. (Schuda Dec. at ¶ 5, Def. Ex. D, ECF No. 94-4).

With respect to the pre-operation area, OhioHealth presents evidence that there are an average of 90 surgeries at the hospital each day, and that all of these surgical patients first go

10

through the pre-operation area. (*Id.* at ¶ 7). While in the pre-operation area, patients undergo intravenous therapy, a full surgical skin preparation, and anesthesia. (*Id.*) OhioHealth's representative, Dr. Schuda, testified:

> Q. And all of those are considered significant procedures?
>
> A. Yes. It's a sterile procedure. Yeah.
>
> Q. And so under this policy, because patients are undergoing significant procedures in the pre-op area, prohibiting animals of all kinds is consistent with this policy, correct?
>
> A. That's correct.
>
> Q. And, again, is that for the safety of the patients?
>
> A. Yes. They're about to have an operation and we want to really -- take every possible precaution to make sure that they're not going to get infected.

(Schuda Dep. at 149, ECF No. 94-2, PageID 1238).

A requested alteration works a fundamental change if it "interfere[s] with the rights of third parties." *Davis v. Echo Valley Condominium Assoc.*, 945 F.3d 483, 492 (6th Cir. 2019) (concerning fundamental alterations in the context of fair housing). Such is the case here. Because allowing a dog into these sensitive areas increases the risk of infection to more vulnerable patients, and thus interferes with their own rights, requiring OhioHealth to accommodate Plaintiff by allowing her dog to enter would fundamentally alter these areas.

Plaintiff argues that allowing admittance to her service dog would not cause a fundamental alteration to these areas of the hospital because, according to Plaintiff, these areas are not completely sterile, and a clean and healthy service dog presents the same risk of transmitting infectious disease as does its handler. (Pl. Resp., ECF No. 114, PageID 2466–67). But just because an area is not completely sterile does not mean that anything goes. Plaintiff relies on the aforementioned 2003 CDC guidelines, but again, by their own terms those guidelines "cannot

11

address every situation . . . ." (ECF No. 95-7, PageID 1546). Those guidelines do not address areas with patients in isolation or pre-operation areas, and Plaintiff has not presented any evidence, expert or otherwise, to make the requisite connection. In the absence of such evidence, the evidence is one-sided.

At bottom, the question is whether allowing a service dog onto the VTS floor containing patients in isolation, and the pre-operation area, would fundamentally alter those areas of the hospital. The evidence reveals that the dog's admission would pose a risk to the health of vulnerable patients, and therefore the question must be answered in the affirmative. The accommodation requested would fundamentally alter these areas. A "third party's rights," and potentially that third party's life, "do not have to be sacrificed at the alter of reasonable accommodation." *Davis*, 945 F.3d at 492 (quotation omitted). No doubt, that is not what Plaintiff desires. But that is the reason the law does not require this accommodation. OhioHealth is entitled to summary judgment.

## IV.

The remaining matters to resolve are Plaintiff's two motions for leave to file. (ECF Nos. 123, 129). The first of these motions requests the admission of an untimely declaration of disability. (ECF No. 123). The second motion requests leave to file an untimely reply in support of the first motion. (ECF No. 129).

Regarding the second motion, (ECF No. 129), that motion is granted. Plaintiff missed the deadline to file by 41 minutes, and this delay did not prejudice Defendant. Accordingly, the Court considered Plaintiff's reply along with the first motion.

The Court thus turns to the first motion, the motion for leave to file an untimely declaration. (ECF No. 123). Plaintiff's motion is government by Fed. R. Civ. P. 16(b)(4) and 6(c)(2). Rule 16

provides that a schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). In turn, Rule 6(c)(2) provides that "any affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). In this case, the dispositive motion deadline was Sep. 18, 2020. (ECF No. 88). Five months later, Plaintiff moved for leave to file this untimely declaration of disability.

In her supporting memorandum, Plaintiff explains that the doctor was previously unwilling to sign a statement concerning whether Plaintiff has a disability. (Pl. Mot. for Leave to File at 2, ECF No. 123). Two others were apparently also unwilling. (*Id.* at 4, 6). A witness's unwillingness to voluntarily provide a statement is, under these circumstances, not good cause. Plaintiff had the ability to subpoena the unwilling witness but did not do so. That choice was made with full knowledge of the consequences. Plaintiff's motion, (ECF No. 123), is denied.

## V.

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for leave to file an untimely reply, (ECF No. 129), but **DENIES** Plaintiff's motion for leave to file an untimely declaration (ECF No. 123). The Court **GRANTS** Defendant's motion for summary judgment, (ECF No. 94), and **DENIES** Plaintiff's motion for summary judgment (ECF No. 95). The Clerk is directed to close this case.

**IT IS SO ORDERED.**

**9/22/2021**                                                    **s/Edmund A. Sargus, Jr.**
**DATED**                                                           **EDMUND A. SARGUS, JR.**
                                                                         **UNITED STATES DISTRICT JUDGE**